STATE of Wisconsin, Plaintiff-Respondent,

v.

Daniel W. BRUCKNER, Defendant-Appellant. †

Court of Appeals

*No. 88-2051-CR. Submitted on briefs March 22, 1989.—*
*Decided August 16, 1989.*

(Also reported in 447 N.W.2d 376.)

† Petition to review denied.

834

For the plaintiff-respondent the cause was submitted on the briefs of *Donald J. Hanaway,* attorney general, with *Barry M. Levenson* and *Thomas J. Balistreri,* assistant attorney generals of counsel, of Madison.

For the defendant-appellant the cause was submitted on the briefs of *Shellow, Shellow & Glynn, S.C.,* with *Stephen M. Glynn* and *Robert R. Henak* of counsel, of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

FINE, J. This case concerns child pornography, which—for the purposes of this decision—means the visual depiction of children "engaging in sexually explicit conduct," as defined by sec. 940.203(6), Stats. (1985–86).[1] Thus defined, child pornography is not protected by the first amendment, *New York v. Ferber,* 458 U.S. 747, 760–761, 764 (1982), even though it may not be legally obscene under the standards promulgated by the United States Supreme Court in *Miller v. California,* 413 U.S. 15 (1973). *Ferber,* 458 U.S. at 760–761, 764. The parties do not contend otherwise.

Daniel W. Bruckner appeals from a judgment convicting him of seven counts of sexual exploitation of children in violation of sec. 940.203(4), Stats. (1985–86), which made it illegal for any person to "knowingly . . . import . . . any . . . photograph . . . or other reproduc-

---

[1] **(6)** In this section:
 (a) "Child" means any person under the age of 18 years.
 (b) "Sexually explicit conduct" means actual or simulated:
 1. Sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or opposite sex;
 2. Bestiality;
 3. Masturbation;
 4. Sexual sadism or sexual masochistic abuse, including but not limited to, flagellation, torture or bondage; or
 5. Lewd exhibition of the genital or pubic area of any person.

This section was repealed and substantially recreated as sec. 948.01(7), Stats. (1987–88). 1987 Wis. Act 332, secs. 29, 55, effective July 1, 1989, 1987 Wis. Act 332, sec. 66a.

tion of a child engaging in sexually explicit conduct."[2] There was no evidentiary trial; no witnesses testified. Rather, the trial court based its findings of guilt on the parties' testimonial stipulation and related exhibits.

## I. The Facts

On July 27, 1983, and between February and August of 1984, twenty-three different magazines mailed from Denmark and addressed to Bruckner at a Milwaukee post office box were seized by the United States Customs Service as obscene. *See* 19 U.S.C. sec. 1305 (1982). The magazines were inspected by a Customs Service special agent who believed, in the words of the parties' stipulation, that they contained "photographs of children engaged in sexually explicit activity with other children including fellatio, sodomy, masturbation and ejaculation." By letter dated July 27, 1983, Bruckner was notified of a seizure that day. Bruckner was similarly notified by the Customs Service of an August 14, 1984, seizure, and he consented to the magazine's administrative forfeiture. Another magazine, which had been seized on July 12, 1984, was placed in Bruckner's post office box on March 27, 1985.

---

[2]Section 940.203, Stats., was repealed and recreated with no substantive change as secs. 948.05, 948.01(1) and (7), Stats., effective July 1, 1989, by sections 29 and 55 of 1987 Wis. Act 332, 1987 Wis. Act 332, sec. 66a. Our analysis is thus equally applicable to the new statutes.

The judgment mistakenly identifies the statute under which Bruckner was convicted as "s. 940.20*5(4)*" (emphasis added). Neither party has made an issue of this apparent typographical error. *See* sec. 971.26, Stats. (judgment's validity not affected by defects in form that do not prejudice defendant).

Bruckner's post office box was kept under surveillance, and, on March 28, 1985, a Postal Service inspector saw "a white male" remove the magazine from the box. Two Customs Service special agents then saw Bruckner, the only person "in the vicinity" of the box, leave the post office with the magazine. They followed and saw him enter a house on North Terrace Avenue in Milwaukee. After twenty minutes, Bruckner left the house but was not seen carrying the magazine.

Later that afternoon, a Customs Service special agent went to the house on North Terrace Avenue with a search warrant that had been issued by a United States Magistrate. As expressed by the parties' stipulation, "[t]he search of [Bruckner]'s master bathroom resulted in the seizure of 146 magazines of foreign origin depicting photographs of children of various ages engaged in various sexual acts with themselves and others including sodomy, fellatio, masturbation, fondling and lewd exhibition of the genitals." The agent also seized ten items of correspondence between Bruckner and third persons. According to the stipulation, the correspondence discussed Bruckner's "interest in distributing, selling or trading copies of photographs of nude boys not engaged in sexual acts with themselves or others."[3] The agent

---

[3] Although the stipulation states that the correspondence discussed Bruckner's interest in "photographs of nude boys not engaged in sexual acts," the correspondence reveals nothing that expressly disclaims that specific interest. To the contrary, the photographs in the various magazines did show young boys engaged in a variety of sexual acts, and Bruckner apparently had the capability to reproduce them. Additionally, one of the letters in evidence was from a man in England who offered to trade photographs with Bruckner, and noted that he had photographs of juveniles engaging in sexually explicit conduct. Bruckner responded that he was interested in establishing a trading rela-

also found "what was, in the agent's opinion, a fairly sophisticated photography lab" as well as negatives and undeveloped film.

Seven of the magazines seized from the house were examined by a physician specializing in pediatric endocrinology. He concluded that the age of the children pictured in the magazines ranged from ten or eleven to fifteen years of age.

Bruckner was charged with seven counts of sexual exploitation of children—one count for each magazine examined by the physician. The counts charged that on dates between June 1983 and December 1983, Bruckner did "knowingly and intentionally import photographs or other reproductions of a child engaging in sexually explicit conduct." On June 14, 1988, the trial court convicted Bruckner on all seven counts, and, after agreeing with the prosecutor and defense attorney that "this is not an incarceration case," imposed $5,000 fines for each count.

Bruckner raises five issues on appeal. First, he contends that the statute does not make the importation of child pornography for personal use only a crime (at sentencing, his lawyer referred to the place where the magazines were found as "a private fantasy closet").[4]

tionship with the man. For purposes of this appeal, however, we accept the facts as set forth in the stipulation.

[4]The trial court rendered a general verdict of guilty on each of the seven counts and did not make a specific finding on whether the material was imported for personal use, or for distribution or sale. *See* sec. 972.02(3), Stats. ("In a case tried without a jury the court shall make a general finding and may in addition find the facts specially."). Although the state argued in the testimonial stipulation "that a fact-finder could conclude that [Bruckner] had the intent to trade, sell or distribute any photograph within his possession and, furthermore, had the capability to

Second, Bruckner argues that if the statute does make the importation for personal use only a crime, it violates the Commerce Clause of the United States Constitution. Third, he submits that Wisconsin may not make the importation of child pornography into this state a crime because regulation of child pornography in interstate commerce has been preempted by federal law. Fourth, he argues that he was subjected to an illegal search because the magistrate lacked probable cause to issue the warrant, and that the magazines should be suppressed. *See Mapp v. Ohio,* 367 U.S. 643 (1961). Finally, he contends that the trial court erred in not giving him a hearing on whether the affidavit submitted to the magistrate in support of the search warrant contained knowingly false statements or statements that were made with a reckless disregard for the truth. *See Franks v. Delaware,* 438 U.S. 154 (1978). We address these issues in turn.

## II. The Statute

Justice Felix Frankfurter pointed out more than forty years ago that "laws are not abstract propositions." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum. L. Rev. 527, 533 (1947). Rather, "[t]hey are expressions of policy arising out of specific situations and addressed to the attainment of particular ends." *Ibid.* As Bruckner recognizes in his submissions here and before the trial court, sec. 940.203, Stats. (1985-86), was

develop and print photographs," both parties have briefed this case, here as well as in the trial court, as one involving importation for Bruckner's personal use only. In a ruling on Bruckner's motion to dismiss that antedated the testimonial stipulation, the trial court interpreted the statute's use of the word "import" as not requiring an intent to sell or distribute the materials brought into this state. Since we agree with that conclusion, we need not remand this case for specific findings on Bruckner's intent.

patterned after S. 1585, 95th Cong., 1st Sess. (1977), which, with some changes not material here, was ultimately enacted into law as the Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. No. 95–225, 92 Stat. 7 (1978), and, as material to our discussion, was codified at 18 U.S.C. secs. 2251–2253.[5] Thus, we may look to the Congressional committee reports on Public Law 95–225 to ascertain the purposes underlying the Wisconsin counterpart at issue here. *See* 2A *Sutherland Statutory Construction,* sec. 52.02, at 522 (N. Singer 4th rev. ed., 1984). *Cf. Wisconsin's Envtl. Decade, Inc. v. Public Serv. Comm'n,* 79 Wis. 2d 161, 174, 255 N.W.2d 917, 925 (1977) (appropriate to consider federal law construing federal statute upon which Wisconsin statute is patterned).

Public Law 95–225 resulted from committee hearings studying sexual exploitation of children. *See* S. Rep. No. 95–438, 95th Cong., 1st Sess. 4–5 (1977) [hereinafter, "Senate Report"], *reprinted in* 1978 U.S. Code Cong. & Admin. News 40, 41–42. The Senate Judiciary Committee reported:

> [O]ne researcher . . . has documented the existence of over 260 different magazines which depict children engaging in sexually explicit conduct . . ..

---

[5]After *Ferber* recognized that child pornography, even though not legally obscene, was not protected by the First Amendment, 458 U.S. at 760–761, 764, Congress amended 18 U.S.C. sec. 2252 to prohibit non-commercial interstate traffic in child pornography, and to delete the requirement that the material be "obscene." Pub. L. No. 98–292, sec. 4, 98 Stat. 204, 204–205. *See* H.R. Rep. No. 98–536, 98th Cong. 2d Sess. (1983), *reprinted in* 1984 U.S. Code Cong. and Admin. News 492. The amendment was effective May 21, 1984, Pub. L. No. 98–292, 98 Stat. 204, 206, which was after Bruckner's violations in this case.

Such magazines depict children, some as young as three to five years of age, in couplings with their peers of the same and opposite sex, or with adult men and women. The activities featured range from lewd poses to intercourse, fellatio, cunnilingus, masturbation, rape, incest and sado-masochism.

*Id.* at 5-6, 1978 U.S. Code Cong. & Admin. News at 43. The committee saw the need for federal action, but also anticipated increasing state response to what Senator Orrin G. Hatch noted was sordid activity that "surely reaches the depths of human depravity" and "inflict[s] irreparable damage on the victims for the rest of their lives." *Id.* at 10, 31, 1978 U.S. Code Cong. & Admin. News at 48, 65. Section 940.203, Stats., addressed this problem for Wisconsin.

Section 940.203(4), Stats. (1985-86), provided:

No person may knowingly produce, perform in, profit from, promote, *import,* reproduce, advertise, sell, distribute, or possess with intent to sell or distribute, any undeveloped film, photographic negative, photograph, motion picture, videotape, sound recording or other reproduction of a child engaging in sexually explicit conduct. [Emphasis added.][6]

[6]As noted, this provision has been replaced by sec. 948.05(1)(c), Stats. (1987-88). It provides:

Sexual exploitation of a child. (1) Whoever does any of the following with knowledge of the character and content of the sexually explicit conduct involving the child is guilty of a Class C felony:

. . ..

(c) Produces, performs in, profits from, promotes, *imports into the state,* reproduces, advertises, sells, distributes or possesses with intent to sell or distribute, any undeveloped film, photographic negative, photograph, motion picture, videotape, sound recording or other reproduction of a child engaging in sexually explicit conduct. [Emphasis added.]

Each violation of sec. 940.203, Stats. (1985–86), was a Class C felony, punishable by a prison term not to exceed 10 years, a fine not to exceed $10,000, or both. Secs. 940.203(5) and 939.50(3)(c), Stats. (1985–86).

Bruckner argues that the word "import" in sec. 940.203(4), Stats. (1985–86), contains an essential commercial or distributional component and that, therefore, he may not be punished for bringing child pornography into Wisconsin for his personal use. As a subsidiary argument, he contends that penal statutes like sec. 940.203(4) should be strictly construed and interpreted in his favor. *See State v. Tronca,* 84 Wis. 2d 68, 80, 267 N.W.2d 216, 221 (1978).[7]

## A.

██

A legislature "expresses its purpose by words" *62 Cases of Jam v. United States,* 340 U.S. 593, 596 (1951) (Frankfurter, J.). We must, therefore, construe what has been written: "It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort." *Ibid.* If

---

Our analysis of sec. 940.203(4), Stats. (1985–86), is equally applicable to sec. 948.05(1)(c), Stats. (1987–88).

[7]Neither party contends that the word "import" means to "bring into the United States from a foreign country" as opposed to "bring into Wisconsin from outside its borders." This is consistent with the statute's revision effective July 1, 1989, which changed the word "import" to the phrase "imports into the state." *Compare* sec. 940.203(4), Stats. (1985–86) *with* sec. 948.05(1)(c), Stats. (1987–88). The official comments to the revision explain that the words "into this state" were added "to clarify that the term 'imports' refers to the importation into the state of the material described in the provision." Wis. Stat. Ann. sec. 948.05, at 94 (West Supp. 1988). No substantive change was intended.

the words are clear, we must not search for ambiguity. *See Ball v. District No. 4, Area Board,* 117 Wis. 2d 529, 538, 345 N.W.2d 389, 394 (1984). On the other hand, if the words are not clear on their face, meaning is determined from the statute's "scope, history, context, subject matter and object." *Ibid.* In that situation, we must "seize[ ] every thing from which aid can be derived." *United States v. Fisher,* 6 U.S. 358, 386, 2 Cranch 202, 205 (1804) (Marshall, C.J.).

Standing alone, the word "import" is ambiguous. It can be used as both a noun and a verb, and has a number of meanings. *Webster's Third New International Dictionary of the English Language* 1135 (1976) [hereinafter, *Webster's Third]*. Used as a verb, as it is in sec. 940.203(4), Stats. (1985–86), "import" can mean—in the order listed by *Webster's Third*—"signify," "express," "imply," "bring from a foreign or external source," or "concern." *Ibid.* Although the word "import" in sec. 940.203(4), Stats. (1985–86), obviously means to bring into Wisconsin from outside its borders, the word is still ambiguous since it either contains commercial or distributional components, as Bruckner argues, or it does not. When viewed through the lenses of context and purpose, however, its meaning is further clarified. *See State ex rel. Madison v. Indus. Comm'n,* 207 Wis. 652, 658, 242 N.W. 321, 324 (1932).

Section 940.203(4), Stats. (1985–86), prohibited a number of activities in connection with child pornography. Only some of those activities, however, have commercial or distributional components: "profit from," "promote," "advertise," "sell," "distribute," and "possess with intent to sell or distribute." The other activities prohibited by sec. 940.203(4) can relate either to private use of the materials, or to their further dissemination (whether for profit or not), depending on the

845

circumstances: "produce," "perform in," "import," and "reproduce." Thus, for example, a pedophile could use a home video camera to produce prohibited child pornography, and perform in that production, for personal use only. Similarly, child pornography can be brought into Wisconsin for either personal use, or for distribution or sale.

Two common threads run through all of the activities prohibited by sec. 940.203(4), Stats. (1985–86). They relate either to the dissemination of child pornography in Wisconsin, or to the increase of child pornography in Wisconsin, or both. Accordingly, a person who produces a sexually explicit video tape involving children adds to the quantity of child pornography in this state whether he keeps it for his own use, sells it, or passes it on to another pedophile. On the other hand, acquisition of child pornography obtained from in-state sources does not.

Our task in interpreting the meaning of the word "import" in sec. 940.203(4), Stats. (1985–86), is assisted by an analysis of the new legislation. *See State v. Smith,* 149 Wis. 2d 89, 101, 438 N.W.2d 571, 576 (1989). The legislature has determined that simple possession of child pornography is less serious than either disseminating it to others, or adding to its quantity in the state. Thus, though mere possession was not prohibited by sec. 940.203(4), Stats. (1985–86), it is now a Class E felony, punishable by imprisonment not to exceed two years, a fine up to $10,000, or both. Secs. 948.12 and 939.50(3)(e), Stats. (1987–88).[8] Importation into Wisconsin, and the other activities that add to the quantity

---

[8] Section 948.12, Stats. (1987–88), provides:

**Possession of child pornography.** Whoever possesses any undeveloped film, photographic negative, photograph, motion picture, videotape or other pictorial reproduction of a child engaged in sexu-

of child pornography in this state, remain Class C felonies. Secs. 948.05(1)(c) and 939.50(3)(c), Stats. (1987–88).[9] The legislature's making criminal the mere possession of child pornography while, at the same time, leaving the language of sec. 940.203(4), Stats. (1985–86), essentially unchanged,[10] demonstrates that importation of child pornography for personal use was intended to be a different crime than that of mere possession. As we have seen, importation—even for personal use—adds to the quantity of child pornography in the state; mere possession does not.

The Wisconsin legislature's decision to make criminal the personal-use importation of child pornography is consistent with *United States v. 12 200-Ft. Reels,* 413 U.S. 123 (1973) and *United States v. Orito,* 413 U.S. 139 (1973), where the Supreme Court upheld the prohibition by 19 U.S.C. sec. 1305(a) on the importation into the United States of obscene material, and the criminalization by 18 U.S.C. sec. 1462 of the shipment of obscene material in interstate commerce, even though, in both cases, the material might have been intended for personal use. *12 200-Ft. Reels,* 413 U.S. at 126–129 (upholding 19 U.S.C. sec. 1305(a)); *Orito,* 413 U.S. at 143 (upholding 18 U.S.C. sec. 1462).

---

ally explicit conduct under all of the following circumstances is guilty of a Class E felony:
 (1) The person knows that he or she possesses the material.
 (2) The person knows the character and content of the sexually explicit conduct shown in the material.
 (3) The person knows or reasonably should know that the child engaged in sexually explicit conduct has not attained the age of 18 years.

[9] *See supra* fn. 5. This difference in treatment is, of course, within the permitted ambit of legislative discretion. *See State v. Duffy,* 54 Wis. 2d 61, 66–67, 194 N.W.2d 624, 627 (1972).
 [10] *See supra* fn. 5.

18 U.S.C. sec. 1462 and 19 U.S.C. sec. 1305(a) were challenged in light of *Stanley v. Georgia,* 394 U.S. 557 (1969), which held that an adult's private possession of obscene materials was constitutionally protected. The challenge's rationale was articulated by the trial court in *Orito* as follows:

> By analogy, it follows that with the right to read obscene matters [recognized by *Stanley v. Georgia*] comes the right to transport or to receive such material when done in a fashion that does not pander it or impose it upon unwilling adults or upon minors . . ..
>
> . . ..
> . . . I find no meaningful distinction between the private possession which was held to be protected in *Stanley* and the non-public transportation which the statute at bar [18 U.S.C. sec. 1462] proscribes.

*United States v. Orito,* 338 F. Supp. 308, 310 (E.D. Wis. 1970), *rev'd,* 413 U.S. 139 (1973). The Supreme Court disagreed. *Orito,* 413 U.S. at 140–141, 143.[11] *Orito's* analysis is helpful here:

> [W]e cannot say that the Constitution forbids comprehensive federal regulation of interstate transportation of obscene material merely because such transport may be by private carriage, or because the material is intended for the private use of the transporter. That the transporter has an abstract proprietary power to shield the obscene material from all others and to guard the material with the same privacy as in the home is not controlling. Congress may

---

[11] As a matter of historical interest, we point out that the law firm representing Bruckner also represented Orito. *See Orito,* 413 U.S. at 139; 338 F. Supp. at 308. Bruckner's argument here is, in its thrust, but a reprise of the contention advanced more than sixteen years ago in *Orito.* That contention was rejected then, and we reject its offshoot now.

regulate on the basis of the natural tendency of material in the home being kept private and the contrary tendency once material leaves that area, regardless of a transporter's professed intent. Congress could reasonably determine such regulation to be necessary to effect permissible federal control of interstate commerce in obscene material, based as that regulation is on a legislatively determined risk of ultimate exposure to juveniles or to the public and the harm that exposure could cause.

*Id.,* 413 U.S. at 143-144. There is an equally significant interest in guarding a border, whether it be the nation's or a state's:

[I]t is extremely difficult to control the uses to which obscene material is put once it enters this country. Even single copies, represented to be for personal use, can be quickly and cheaply duplicated by modern technology thus facilitating wide-scale distribution.

*12 200-Ft. Reels,* 413 U.S. at 129. The geometric explosion of modern technology's capabilities makes the Supreme Court's 1973 analysis of the dangers of personal-use importation in the current context even more relevant today than when it was written.

██

The Wisconsin legislature has chosen to combat the scourge of child pornography by an interdiction at its source, whether the source is at the state's border or an in-home photography studio. A person who adds to this state's pool of child pornography—by production, reproduction, or importation—violates the law whether he does it for profit or, in the words of Bruckner's counsel, for "private fantasy." Thus, though we heed Judge Learned Hand's admonition against making a "fortress out of the dictionary," *Cabell v. Markham,* 148 F.2d 737,

739 (2d Cir. 1945), *aff'd,* 326 U.S. 404 (1945), the definition of the verb "import" as "bring from a foreign or external source" found in *Webster's Third,* clearly gives effect to the legislative purpose, and is the meaning supported by the word's context.[12]

Since we have determined that the word "import" in its context and when analyzed by the light of legislative intent is not ambiguous, it is not appropriate to impose a rule of strict construction favoring the defendant as Bruckner urges. *See State v. Morris,* 108 Wis. 2d 282, 289–290, 322 N.W.2d 264, 267–268 (1982) (penal statute construed in favor of defendant when its meaning remains ambiguous). Injecting "import" with a commercial or distributional element would add to the stat-

---

[12] Bruckner's reply brief quotes an example of "import" given by an abridgement of *Webster's Third* in conjunction with the definition: "to bring from a foreign or external source; *esp.:* to bring (as merchandise) into a place or country from another country." *Webster's Ninth New Collegiate Dictionary* 605 (1986). The full text of the relevant definition of "import" found in *Webster's Third* gives a number of examples, only few of which clearly denote a commercial component:

> to bring from a foreign or external source: introduce from without <food [import]*ed* into the city from surrounding farms> <another murder case . . . distinguished by the local animosities sought to be [import]*ed* into the trial—H.W.H. Knott> <[import]*ed* some college boys for the dance>; *esp:* to bring (as wares or merchandise) into a place or country from another country <a business that [import]*ed* toys from Japan> <[import]*ed* wheat during the grain shortage> <Icelanders . . . [import]*ed* the literature of the Continent, translating it into their own tongue—Charlton Laird> <Canada also [import]*s* a great many leading scientists—*Report: (Canadian) Royal Commission on Nat'l Development*>—opposed to *export.* [Ellipses and emphasis in original.]

It is the verb defined irrespective of commercial or distributional intent, however, that comports with the underlying purpose of sec. 940.203(4), Stats. (1985–86).

ute and distort its meaning. This we may not do. *See 62 Cases of Jam v. United States,* 340 U.S. at 596; *United States v. Gaskin,* 320 U.S. 527, 529–530 (1944) (construing penal statute in favor of accused "does not require distortion or nullification of the evident meaning and purpose of the legislation.")

> 'The canon in favor of strict construction [of criminal statutes] is not an inexorable command to override common sense and evident statutory purpose . . ..
> Nor does it demand that a statute be given the 'narrowest meaning'; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers.'

*United States v. Moore,* 423 U.S. 122, 145 (1975) (brackets and ellipses in original) (quoting *United States v. Brown,* 333 U.S. 18, 25–26 [1948]).

### B.

Bruckner contends that if sec. 940.203(4), Stats. (1985–86), prohibits the importation of child pornography for personal use, it violates the Commerce Clause. We disagree.

The Commerce Clause provides that "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, sec. 8, cl. 3. Its scope is broad, consistent with the "purpose of securing the 'maintenance of harmony and proper intercourse among the States,'" *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 551 (1944) (quoting *The Federalist* No. 41 (J. Madison) (Rev. ed., N.Y. 1901), located also at *The Federalist Papers* 256 [C. Rossiter ed. 1961]), and "extends to intrastate activities that

851

affect interstate commerce." *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 537 (1985). The clause not only grants power to Congress, it is also a restriction on state regulation. *Maine v. Taylor,* 477 U.S. 131, 137 (1986). Nevertheless, "the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 36 (1980). This retained authority was characterized by Chief Justice Marshall as "that immense mass of legislation which embraces every thing within the territory of a State not surrendered to the general government," *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 203 (1824), including the authority of states to protect their citizens from the importation of articles that endanger the public health or safety, *Brown v. Maryland,* 25 U.S. (12 Wheat.) 419, 443 (1827). Thus, bona fide quarantine laws are valid as long as "they do not come into conflict with Federal action," *Simpson v. Shepard,* 230 U.S. 352, 406 (1913); *accord, Philadelphia v. New Jersey,* 437 U.S. 617 (1978), even though they may involve the " 'outright prohibition of entry.' " *Taylor,* 477 U.S. at 148–149 n. 19 (Maine statute barring the importation of live baitfish did not violate Commerce Clause) (quoting *Lewis,* 447 U.S. at 43).

The test we must apply requires a balancing of interests:

> Where the [state] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden tolerated will of course

> depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970) (citation omitted). Section 940.203(4), Stats. (1985–86), passes this test.

On one hand, there is no doubt but that Wisconsin has a significant interest in restricting the proliferation of child pornography, *cf. Ferber,* 458 U.S. at 757 ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."), and, as we have seen, modern technology makes it "extremely difficult to control" what happens to this type of material once it enters the state. *See 12 200-Ft. Reels,* 413 U.S. at 129.

On the other hand, Wisconsin's interdiction of child pornography at its borders has no impact upon commerce between the other forty-nine states. Although sec. 940.203(4), Stats. (1985–86), did restrain interstate commerce in the sense that it prohibited receipt of child pornography in Wisconsin if the child pornography came from sources outside the state, that restraint is permitted when it is "demonstrably justified by a valid factor unrelated to economic protectionism," *Healy v. The Beer Inst., Inc.,* 491 U.S. —, —, 109 S. Ct. 2491, 2501 (1989) (citing *Taylor* as an example), that is, when the restraint is incidental, or ancillary, to some other legitimate purpose.

Section 940.203(4), Stats. (1985–86), was not an exercise of "local parochialism" so as to make it suspect under the Commerce Clause. *See Lewis,* 447 U.S. at 43. It was not enacted to, and did not in fact operate to, protect in-state producers or purveyors of child pornography from out-of-state competition. Rather, it was a true quarantine statute that "did not discriminate

against interstate commerce as such, but simply prevented traffic in noxious articles, whatever their origin." *Philadelphia v. New Jersey,* 437 U.S. at 629.

At the time Bruckner violated sec. 940.203(4), Stats. (1985–86), by importing the magazines containing photographs of children engaging in sexually explicit conduct, (June through December, 1983), the United States Supreme Court had already ruled that those types of photographs were not protected by the First Amendment. *See Ferber,* 458 U.S. at 764. And, as Bruckner apparently recognized by his failure to contest forfeiture of similar material under 19 U.S.C. sec. 1305, the magazines were also excludable from the United States. It would strain the Constitution beyond repair to hold that the Commerce Clause prevents Wisconsin from barring importation of materials that are not otherwise constitutionally protected. *Cf. Miller,* 413 U.S. at 32 n.13 ("Obscene material may be validly regulated by a State in the exercise of its traditional local power to protect the general welfare of its population despite some possible incidental effect on the flow of such materials across state lines.") (citing cases involving the right of states to enact quarantine laws). Accordingly, section 940.203(4), Stats. (1985–86), did not offend the Commerce Clause.

## C.

Bruckner also seeks reversal on the ground that the Supremacy Clause, in conjunction with the Commerce Clause, prevents Wisconsin from barring the importation of child pornography.

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme

Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As articulated by Chief Justice Marshall, no state may "retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 436 (1819).

As noted in Part B, above, the states have traditionally had authority under the Commerce Clause to enact bona fide quarantine laws as an exercise of their legitimate police power, *See Brown,* 25 U.S. (12 Wheat.) at 443. Since sec. 940.203(4), Stats. (1985–86), is such a law, there is no federal preemption "unless that was the clear and manifest purpose of Congress," *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947).

> The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakenly so ordained.

*Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142 (1963). The critical test is whether the state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* at 141 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67 [1941]).

It is common in our republican form of government for certain activity to be proscribed by both federal and state law. *See* W. LaFave & A. Scott, *Substantive Crimi-*

*nal Law,* sec. 2.15(b), at 263 (1986). If the same act violates both federal and state law, it may be punished by both sovereigns. *Abbate v. United States,* 359 U.S. 187 (1959) (double-jeopardy analysis); *Bartkus v. Illinois,* 359 U.S. 121, 127–139 (1959) (due-process analysis, drawing on authorities interpreting the double jeopardy clauses of the federal and state constitutions); *State ex rel. Cullen v. Ceci,* 45 Wis. 2d 432, 456–457, 173 N.W.2d 175, 186–187 (1970).

Parallel federal and state regulation is permitted unless the state law impermissibly intrudes upon, and interferes with, a vital federal concern. *See California v. Zook,* 336 U.S. 725 (1949). Stated another way, preemption is not automatic every time a state statute coincides with a federal law that has taken the " 'subject-matter in hand.' " *Id.* at 729–733 (quoting *Charleston & Western Carolina Ry. Co. v. Varnville Furniture Co.,* 237 U.S. 597, 604 [1915]); *See also State ex rel. Cornellier v. Black,* 144 Wis. 2d 745, 751–756, 425 N.W.2d 21, 23–25 (Ct. App. 1988) (prosecution of corporate officer for homicide by reckless conduct under Wisconsin law where employee killed in plant explosion not preempted by the Occupational Safety and Health Act of 1970, 29 U.S.C. secs. 651–678).

Bruckner's preemption argument leans heavily on *Pennsylvania v. Nelson,* 350 U.S. 497 (1956), which struck down a Pennsylvania law insofar as it outlawed sedition against the United States. The Supreme Court's decision in *Nelson,* however, was based on the substantial showing that the Pennsylvania law would significantly hamper enforcement of a nearly identical federal statute. *Id.* at 505–510. Sedition against the United States "is not a *local* offense" but "is a crime against the *Nation,*" *Nelson,* 350 U.S. at 505 (quoting *Common-*

*wealth v. Nelson,* 104 A.2d 133, 142 [1954] [concurring opinion] [emphasis in original]). Child pornography, however, is a crime against us all—state *and* nation. Accordingly, as in the enforcement of our drug laws, where the "interlocking trellis of Federal and State law . . . enable[s] government at all levels to control more effectively the drug abuse problem," Unif. Controlled Substances Act, 9 [Part II] U.L.A. 1, 2 (1988), federal and state regulation of child pornography results in a partnership that enhances rather than retards the underlying goal of protecting children from sexual exploitation. Indeed, as we have already mentioned earlier, Congress specifically anticipated this partnership with approval. Senate Report at 10, 1978 U.S. Code Cong. & Admin. News at 48.[13]

In sum, there is nothing in the federal statutes regulating child pornography, or in their legislative history, that permits even an inference, much less the required "unambiguous congressional mandate," *Florida Lime & Avocado Growers,* 373 U.S. at 147, that Congress meant to preempt regulation of this problem. Additionally, the ban on the importation of child pornography for private use found in sec. 940.203(4), Stats. (1985–86), is not, in any way, "an obstacle to the accomplishment and execution of the full purposes and objectives" that Congress had in entering the field. *Hines,* 312 U.S. at 67. It thus passes Supremacy Clause muster. *See Florida Lime & Avocado Growers,* 373 U.S. at 141–152.

---

[13] Although Congress has specifically announced that its comprehensive regulation of controlled substances was not meant to preempt non-conflicting state laws, 21 U.S.C. 903, such a specific disclaimer of preemptive intent apparently was not deemed to be necessary in the child-pornography area, given this legislative history.

### III. The Search

As we have seen, Bruckner was convicted of importing seven magazines containing pictures of children engaged in sexually explicit conduct ("child pornography"). We now discuss his contentions that (1) the magazines were discovered as the result of an illegal search, and (2) he was entitled to a hearing to determine whether the affidavit presented to the magistrate in support of the search warrant contained a knowingly or recklessly false statement.

### A.

The United States and Wisconsin constitutions protect us from "unreasonable searches and seizures":

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Other than minor grammatical differences, this provision is identical to article I., section 11 of the Wisconsin Constitution. *State v. Fry,* 131 Wis. 2d 153, 172, 388 N.W.2d 565, 573 (1986), *cert. denied,* 479 U.S. 989 (1986). Accordingly, "we have consistently conformed the law of search and seizure under the Wisconsin Constitution to that developed by the United States Supreme Court under the federal constitution." *State v. Tompkins,* 144 Wis. 2d 116, 131, 423 N.W.2d 823, 829 (1988).[14]

---

[14] Although, it is "conceivable" that the United States Supreme Court might interpret the Fourth Amendment in a way

The warrant authorizing the search in this case was issued by a federal magistrate on the basis of an affidavit sworn to by a Customs Service special agent. The March 28, 1985, application sought a warrant authorizing a search at a house on North Terrace Avenue in Milwaukee for a magazine entitled "Wonderboy 52" as well as related material. "Wonderboy 52" was described in the warrant application as containing "various photographs of adolescent children of all ages engaged in a variety of sexual acts with themselves and other children." The agent's five-page affidavit in support of the application told the magistrate a number of things, which we summarize as follows:

—that the Customs Service had intercepted "various parcels," addressed to Bruckner at a post office box number and had seized them;

—that when Bruckner was notified about a number of the seizures, he consented to their administrative forfeiture;

—that the parcels contained magazines with such titles as "Showboy," "Superboy," "Dreamboy," "Wonderboy," "Joyboy," and "Girlboys";

—that another agent of the Customs Service was notified by a Los Angeles police detective that Bruckner "was a listed member of the Childhood Sexuality Circle";

—that "the purpose" of the "Childhood Sexuality Circle" is the "sexual liberation of children and pedophile contacts";

that would undermine protections recognized by the Wisconsin Constitution, *Fry*, 131 Wis. 2d at 174, 388 N.W.2d at 574, that situation has not yet arisen. *See Tompkins*, 144 Wis. 2d at 135, 423 N.W.2d at 831. Bruckner does not argue for greater protection under the Wisconsin Constitution than that recognized under the Fourth Amendment.

—that a postal inspector told another Customs Service agent that the post office box to which the seized parcels were addressed was registered to Bruckner;

—that Bruckner's driver's license records gave his residence address as East Holt Avenue and described him as a white male;

—that on July 12, 1984, the Customs Service intercepted a parcel addressed to Bruckner at his post office box number;

—that the parcel was affixed with two postal stamps from Denmark and contained a magazine entitled "Wonderboy 52";

—that the affiant examined "Wonderboy 52," and that "it contain[ed] photographs of adolescent children engaged in a variety of sexually explicit conduct (as defined in 18 U.S.C. sec. 2255) sexual acts with themselves and children, including masturbation, fellatio, lewd exhibition of the genitals, and anal/genital intercourse";

—that on March 27, 1985, the affiant gave the parcel containing "Wonderboy 52" to an inspector with the Postal Service;

—that on March 28, 1985, the Postal Service inspector told the affiant that the inspector had placed the parcel in Bruckner's post office box, and that the inspector had seen "a white male reach into the box and remove the article";

—that "U.S. Customs Special Agents observed a white male identified as Daniel Bruckner going from the Post Office to [the North Terrace Avenue address for which the search warrant was sought] with the parcel in his possession";

—that the man identified as Bruckner "entered the residence [on North Terrace Avenue] at approximately 12:12 p.m. on March 28, 1985";

—that at "approximately 12:13 p.m. on March 28, 1985, [affiant] was informed by [another Customs

Service agent] who ha[d] been observing the [North Terrace Avenue residence] since approximately 12:12 p.m. that no person has left the residence taking with them [*sic*] the parcel described above";

—the Customs Service agents "are keeping the residence under constant surveillance and believe the parcel is still on the premises";

—that according to "local tax and utility records," Bruckner was the "sole owner and occupant of the residence."

The federal magistrate issued the search warrant on March 28, 1985, the same day the application was presented to him. Bruckner claims the warrant affidavit was defective because it did not establish probable cause that the magazine was in the house, since the affidavit did not specifically state that anyone saw him enter with the parcel. 

Our review of the magistrate's decision to issue the warrant, though independent of the trial court's analysis, *see Tompkins,* 144 Wis. 2d at 121, 423 N.W.2d at 825, is limited:

[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of a *de novo* review. A magistrate's 'determination of probable cause should be given great deference by reviewing courts.'

*Illinois v. Gates,* 462 U.S. 213, 236 (1983) (emphasis in original) (quoting *Spinelli v. United States,* 393 U.S. 410, 419 [1969]). A judicial officer faced with a request for a search warrant must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238. Our task as a

861

reviewing court "is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238–239 (brackets and ellipses in original) (quoting *Jones v. United States,* 362 U.S. 257, 271 [1960]). If the matter is close, we must give the magistrate the benefit of the doubt and sustain the search. *United States v. Ventresca,* 380 U.S. 102, 109 (1965).

The affidavit seeking a search warrant for the North Terrace Avenue address told the magistrate a number of significant things. First, Bruckner owned the house for which the warrant was sought. Second, he had received materials before, addressed to his post office box, that were similar to the magazine that was thought to be in the house. Third, Bruckner's membership in the Childhood Sexuality Circle, as that group was described in the affidavit, made it likely that he was a willing recipient of not only the magazines that had been seized, but also the magazine that was the subject of the warrant request. Fourth, the postal box into which the magazine was placed was registered to Bruckner. Fifth, Bruckner was white, and a "white male" was seen removing the magazine from the postal box. Sixth, Bruckner was seen leaving the post office, and traveling to the house with the magazine in "his possession." Seventh, he was seen entering the house. Eighth, no one left the house with the magazine. Although apparently no one actually saw Bruckner bring the magazine into the house because the affidavit is silent on this point, it was an inference that a reasonable person could draw from the facts presented. *See Bast v. State,* 87 Wis. 2d 689, 693, 275 N.W.2d 682, 684 (1979) (In determining whether an affidavit establishes probable cause, a "magistrate may make the usual inferences reasonable persons would draw from the facts

presented.") Stated another way, the information presented to the magistrate made it "a fair probability" that Bruckner carried the magazine into the house. *See Gates,* 462 U.S. at 238. Bruckner's argument to the contrary, impermissibly reads the affidavit in a "nitpicking, hypertechnical manner." *See United States v. Gaertner,* 705 F.2d 210, 212 (7th Cir. 1983), *cert. denied,* 464 U.S. 1071 (1984). The magistrate's conclusion that there was probable cause to believe that the "Wonderboy 52" was in the house on North Terrace Avenue must be sustained.

## B.

Bruckner's final argument is that there was a knowingly- or recklessly-made false statement in the affidavit, and that, accordingly, the materials discovered during the search must be suppressed. *See Franks v. Delaware,* 438 U.S. 154, 155–156, 171 (1978). His specific complaint on appeal is that the trial court did not give him an evidentiary hearing on his allegations. *See ibid.*

*Franks* recognized that the constitutional requirement that search warrants be issued only upon a showing of probable cause would have little efficacy if the showing was not required to be "truthful." *Id.* at 164–165. Accordingly, it fashioned a rule of "limited scope," *id.* at 167, that:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by

the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155–156.

The gravamen of Bruckner's request for a *Franks* hearing was set out in his counsel's affidavit presented to the trial court, which represented the following: (1) "Wonderboy 52" was not found in the house on North Terrace Avenue during the search, as evidenced by the return to the executed search warrant, which listed the items seized; (2) Bruckner told his lawyer that "although he [Bruckner] picked up 'Wonderboy 52' from his post office box as described in the search warrant [affidavit], he did not take the magazine into [the house on North Terrace Avenue] on March 28, 1985"; and, (3) Bruckner told his lawyer that "Wonderboy 52" "was never taken into the premises" on North Terrace Avenue. Although we independently determine the sufficiency of this affidavit, *cf. State v. Clappes,* 136 Wis. 2d 222, 235, 401 N.W.2d 759, 765 (1987), we agree with the trial court that it did not satisfy the threshold requirement for an evidentiary hearing under *Franks.*[15]

---

[15] The affidavit's hearsay recitation of what Bruckner told his counsel does not satisfy *Franks*' requirement that a defendant submit "[a]ffidavits or sworn or otherwise reliable statements of witnesses," or, if they are not obtainable, "their absence satisfactorily explained." *Franks,* 438 U.S. at 171. *Cf. Kraemer Bros. v. United States Fire Ins. Co.,* 89 Wis. 2d 555, 571, 278 N.W.2d 857, 864 (1979) (affidavits submitted on motion for summary judgment must be based on personal knowledge); *Hopper v. City of Madison,* 79 Wis. 2d 120, 131, 256 N.W.2d 139, 143–144 (1977)

Bruckner argues, in essence, that *if* the surveillance team did not see him take the magazine into the house, the affidavit submitted in support of the warrant should have said so. Omitting this information, he contends, misled the magistrate into believing that they *did* see him take the magazine into the house but forgot, apparently, to mention it.[16] Bruckner claims the omission was a deliberate attempt to mislead, *cf. Franks,* 438 U.S. at 171 ("Allegations of negligence or innocent mistake are insufficient."), and that the affidavit's implication that Bruckner took the magazine into the house was false.

The fallacy of Bruckner's position is patent when the relevant portion of the warrant affidavit is rewritten to include the information allegedly omitted. *See United States v. Lueth,* 807 F.2d 719, 726 (8th Cir. 1986). The added material, as incorporated into a portion of our summary, *see supra* pp. 33-35, is indicated by italics:

> —that "U.S. Customs Special Agents observed a white male identified as Daniel Bruckner going from the Post Office to [the North Terrace Avenue address for which the search warrant was sought] with the parcel in his possession";
> —that the man identified as Bruckner "entered the residence [on North Terrace Avenue] at approxi-

(affidavit submitted by attorney containing matters not within his personal knowledge may not be considered in support of motion for summary judgment). This defect in counsel's submission has not been raised by the State, and—in the interest of judicial economy—we treat counsel's statements recounting what Bruckner told him as if they were in an affidavit submitted by Bruckner.

[16] Bruckner's brief puts it this way: "the affiant's omission of the material fact that no one had observed the magazine being taken into the premises added to the misleading and false impression that such had occurred."

mately 12:12 p.m. on March 28, 1985, *but that persons observing Bruckner could not determine whether or not he was carrying the magazine at the time he entered the residence";*

—that at "approximately 12:13 p.m. on March 28, 1985, [affiant] was informed by [another Customs Service agent] who ha[d] been observing the [North Terrace Avenue residence] since approximately 12:12 p.m. that no person has left the residence taking with them [*sic*] the parcel described above";

—that Customs Service agents "are keeping the residence under constant surveillance and believe the parcel is still on the premises."

Even with the new material, the affidavit states probable cause; one could still draw the reasonable inference that Bruckner carried the magazine into the house.

■■■■

Bruckner was not entitled to the evidentiary hearing he sought for two reasons. First, the affidavit submitted by Bruckner's counsel does not satisfy the requirement of "a substantial preliminary showing" that the agent executing the warrant affidavit was guilty of either perjury or reckless disregard of the truth. *See Franks,* 438 U.S. at 155–156, 171; *United States v. Williams,* 737 F.2d 594, 602 (7th Cir. 1984), *cert. denied,* 470 U.S. 1003 (1985) ("reckless disregard" element requires proof that affiant " 'in fact entertained serious doubts as to the truth of his' allegations") (quoting *St. Ament v. Thompson,* 390 U.S. 727, 731 [1968]). Second, the agent's affidavit would have supported the magistrate's decision to issue the warrant even if it had explicitly stated that no one saw Bruckner take the magazine into the house. *See Lueth,* 807 F.2d at 726; *Williams,* 737 F.2d at 604. *Cf. Franks,* 438 U.S. at 156, 171–172 (war-

866

rant sustained if affidavit establishes probable cause with the "false" material removed).

## IV. Conclusion

In sum, the trial court correctly determined that the word "import" encompasses child pornography brought into this state for personal use, correctly refused to dismiss this case on the basis of either the Commerce Clause or the Supremacy Clause, correctly refused to suppress the magazines discovered during the North Terrace Avenue search, and correctly refused to order a *Franks* evidentiary hearing.

*By the Court.*—Judgment affirmed.