William K. HAZELTON, Petitioner-Respondent,†

v.

STATE PERSONNEL COMMISSION, Respondent-Appellant,

Wisconsin DEPARTMENT OF MILITARY AFFAIRS, Intervenor-Appellant.

Court of Appeals

*No. 92–2569. Oral argument June 3, 1993.—Decided August 11, 1993.*

(Also reported in — N.W.2d —.)

†Petition to review filed.

On behalf of the intervenor-appellant, there were briefs and oral argument by *James E. Doyle*, attorney general and *Bruce A. Olsen*, assistant attorney general. *Bruce A. Olsen* argued.

On behalf of the petitioner-respondent, there was a brief and oral argument by *Jacqueline Macaulay* of *Borns, Macaulay & Jacobson* of Madison. *Jacqueline Macaulay* argued.

Before Anderson, P.J., Brown and Nettesheim, JJ.

ANDERSON, P.J. The Wisconsin Department of Military Affairs appeals from an order of the circuit court reversing the decision of the State Personnel Commission. The commission held that congressional regulation of personnel criteria for the national guard preempts the application of Wisconsin's anti-discrimination law. We conclude that Congress' clear intent is to occupy the field of regulation of personnel criteria for national guard members. Under the principles of preemption, Congress' occupation of a field prevents

Wisconsin from legislating in the same field. Therefore, we reverse.

William K. Hazelton became a part-time member of the Wisconsin Army National Guard (WIARNG) in 1961; in January 1988, he was a major and serving as a chemical staff officer.[1] In January 1988, Hazelton tested positive for the human immunodeficiency virus (HIV) associated with acquired immune deficiency syndrome (AIDS). The national guard's policy, issued by the Department of the Army, required a second test to confirm the presence of the HIV virus. The results of Hazelton's second test confirmed the presence of the virus in his bloodstream. On February 2, 1988, WIARNG told Hazelton that federal national guard policy required him to select one of three separation options. Hazelton's first option was to retire. He was ineligible for retirement because he had three years to serve before reaching his earliest retirement date. His second option was separation from all military units. Third, he could transfer to the standby reserve where he could earn points toward retirement by paying for his military training. This option was unavailable to Hazelton because army regulations limited an individual to two years in the standby reserve and Hazelton had three years to serve to reach his earliest retirement date.

Hazelton declined to select any of the options for voluntary separation. He believed the army policy on treatment of personnel testing positive for HIV discriminated against members of WIARNG. On March 30, WIARNG notified Hazelton that he would be honor-

---

[1] The Wisconsin Army National Guard is a component of the militia of the state under ch. 21, Stats. The Department of Military Affairs is charged with the responsibility of administering the national guard. Section 21.015(1), Stats.

ably discharged and involuntarily transferred to the standby reserve.

Hazelton appealed his discharge and transfer through channels to the Secretary of the Army. In this appeal, Hazelton contended that the blanket policy of involuntary separation of officers in the national guard was discriminatory because the army evaluated active duty soldiers on a case-by-case basis and if HIV-positive soldiers were asymptomatic they could remain on duty. The army denied Hazeltons appeal and approved his involuntary separation on December 27, 1988.

During 1988, the policy of the national guard concerning members who tested positive for HIV was in a state of transformation. Hazelton's discharge came under a policy issued by the Department of the Armys national guard bureau on December 2, 1987. This policy required the involuntary transfer of members to the standby reserve if they tested positive for HIV. This policy was later incorporated in Army Regulation 600–110, chapter 5, ARNG and USAR Personnel Policies and Procedures, Identification, Surveillance, and Administration of Personnel Infected with Human Immunodeficiency Virus (HIV). The updated version of this regulation was effective April 11, 1988. While requiring the involuntary transfer to the standby reserve of soldiers in the national guard or ready reserve, the regulation permitted a case-by-case evaluation of active duty soldiers testing positive for HIV. While Hazeltons appeal was pending, the national guard rescinded the policy to involuntarily remove HIV-positive members from the national guard and adopted the regular army's case-by-case evaluation.

Hazelton filed a "Charge of Discrimination" with the State Personnel Commission in November 1988 alleging that under the provisions of secs. 111.31 to

111.395, Stats., Wisconsin's Fair Employment Act (WFEA), the Wisconsin Department of Military Affairs (DMA) discriminated against him when it involuntarily transferred him to the standby reserve.[2] He alleged that he had been discriminated[3] against both because of a handicap[4] and his sexual orientation.[5]

DMA initially objected to the commission's jurisdiction. DMA argued before the commission that Hazelton was not an employee of the state and not covered by WFEA. According to DMA, the decision to

[2] The State Personnel Commission is charged with investigating charges of discrimination leveled by state employees against a state agency as an employer. Sections 111.375(2) and 230.45(1)(b), Stats.

[3] Section 111.322(1), Stats., defines an act of employment discrimination as any of the following:

> To refuse to hire, employ, admit or license any individual, to bar or terminate from employment or labor organization membership any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment or labor organization membership because of any basis enumerated in s. 111.321.

[4] For the purpose of WFEA, a handicapped individual is a person who:

> (a)  Has a physical or mental impairment which makes achievement unusually difficult or limits the capacity to work;
>
> (b)  Has a record of such an impairment; or
>
> (c)  Is perceived as having such an impairment.

Section 111.32(8), Stats. In *Racine Unified School Dist. v. LIRC*, 164 Wis. 2d 567, 598–608, 476 N.W.2d 707, 719–23 (Ct. App. 1991), we held that persons with AIDS are handicapped individuals under WFEA.

[5] "Sexual orientation" is defined in sec. 111.32(13m), Stats., as "having a preference for heterosexuality, homosexuality or bisexuality, having a history of such a preference or being identified with such a preference."

involuntarily transfer Hazelton was made by the Secretary of Defense and not WIARNG. The commission held that membership in WIARNG has characteristics that encourage the application and protection of WFEA to WIARNG and its members. The commission acknowledged that DMA was only enforcing the policy of the Secretary of Defense but that it did so as an employer and was subject to WFEA.

The parties then filed a stipulation of facts and briefed the issue of application of WFEA to Hazelton's involuntary transfer. The commission held that it did not have authority to act on Hazeltons complaint and dismissed the complaint on the grounds of federal preemption. The commission reasoned that "[t]he federal government has regulated where it has constitutional and statutory authority to regulate — i.e., with respect to the personnel criteria for national guard membership — and these federal regulations are in conflict with state law governing nondiscrimination in employment."

Hazelton filed an action for judicial review of the commissions decision under secs. 111.395 and 227.53, Stats. He sought reversal of the commissions conclusion that federal preemption precluded the application of WFEA to his involuntary transfer to the standby reserve. He also asked the circuit court to hold that DMA had arbitrarily and capriciously interpreted and applied the applicable army regulations and arbitrarily and capriciously denied his appeal. He sought reinstatement into WIARNG with the restoration of all back pay and benefits. In the alternative, he asked for a retroactive award of credit for service from April 1, 1988.

The circuit court reversed the commissions decision and remanded the case for a hearing. The circuit

court determined that Congress has not exercised its constitutional authority to impose a standard of order on the national guard units of the states. The circuit court reasoned that the reservation to Congress of the right to prescribe discipline for the national guard included the authority to require state national guard units to adopt and enforce personnel policies concerning HIV-positive individuals.

The circuit court decided that no "federal statute expressly or implicitly informs the state that once it opts into inclusion into the federal national guard it loses its option to decline to adopt regulations contrary to its own policies." The court held that, under the test of federal preemption, Congress has not acted to the absolute exclusion of a states fair employment laws in the regulation of an individuals qualifications to serve in the national guard.

On appeal, DMA argues that Congress has exercised its authority to preempt the enforcement of WFEA. DMA points out that the constitution establishes the supremacy of federal law in the raising and supporting of armies and in the organization and discipline of the militia. DMA asserts that because there is an actual conflict with the federal policy of blanket discharge of HIV-positive national guard members and WFEAs policy of case-by-case consideration, the federal law controls. DMA questions the circuit courts conclusion that the governing statutory scheme gives Wisconsin the option to decline to adopt regulations contrary to its own policies. DMA posits that the militia clause does not permit Wisconsin to accept and reject federal regulations of the national guard on a case-by-case basis.[6]

---

[6] As an alternative to its argument that the enforcement of WFEA is preempted by federal regulation, DMA maintains that

784

Although this appeal is from the order of the circuit court, we conduct a *de novo* review of the commissions decision that the commission was preempted from action by federal law. *See Racine Unified School Dist. v. LIRC*, 164 Wis. 2d 567, 583, 476 N.W.2d 707, 713 (Ct. App. 1991). Whether federal law preempts state law is a question of law. *Universal Foods Corp. v. LIRC*, 161 Wis. 2d 1, 5, 467 N.W.2d 793, 794 (Ct. App.), *cert. denied*, 112 S. Ct. 332 (1991). Ordinarily we give deference to an agencys decisions on questions of law because of the agencys special expertise and experience. *Racine Unified*, 164 Wis. 2d at 583, 476 N.W.2d at 713. When the decision of the agency deals with the scope of the agencys powers, deference is not appropriate. *See Board of Regents of the Univ. of Wis. Sys. v. Wisconsin Personnel Comm'n*, 103 Wis. 2d 545, 551, 309 N.W.2d 366, 369 (Ct. App. 1981). Also, when this court is as competent as the agency to decide a question of law, we do not give deference to the agencys decision. *Schachtner v. DILHR*, 144 Wis. 2d 1, 4, 422 N.W.2d 906, 908 (Ct. App. 1988).

■

Federal preemption of state law is not a concept unique to administrative law. To the contrary, it is an issue in many areas of the law. *See, e.g., Wisconsin Pub. Intervenor v. Mortier*, 111 S. Ct. 2476 (1991), *rev'g*

---

the broad protections of WFEA are not applicable to members of WIARNG. DMA compares sec. 21.35, Stats., with WFEA and insists that the narrower anti-discrimination protections of sec. 21.35 apply to guard members. DMA contends that the Wisconsin legislature has intended to withhold handicap as a protected status from members of WIARNG. Because we conclude that Congress has preempted Wisconsin in this field, we do not address DMA's alternative argument.

*Mortier v. Town of Casey*, 154 Wis. 2d 18, 452 N.W.2d 555 (1990) (the United States Supreme Court reversing the conclusion of the Wisconsin Supreme Court that federal law preempts a town ordinance regulating the use of pesticides); *State v. Bruckner,* 151 Wis. 2d 833, 857, 447 N.W.2d 376, 386 (Ct. App. 1989) (holding that the federal statute regulating child pornography in interstate commerce does not preempt Wisconsins criminal statute proscribing the sexual exploitation of children); *State ex rel. Cornellier v. Black,* 144 Wis. 2d 745, 755, 425 N.W.2d 21, 25 (Ct. App. 1988) (determining that the federal Occupational Safety and Health Act did not preempt the state from pursuing a charge of homicide by reckless conduct against a corporate officer when a corporate employee died in an industrial accident). We conclude that we owe no deference to the commission's decision that it was without authority to consider Hazelton's complaint.

We now consider the commission's conclusion that the federal government has preempted the application of Wisconsin's anti-discrimination law to members of WIARNG. Under the supremacy clause of the United States Constitution,[7] state laws that obstruct or are contrary to laws of Congress made pursuant to the constitution are invalid. *See Mortier*, 111 S. Ct. at 2481. There are two principal ways in which federal law may preempt state action. The first way, "field preemption,"

---

[7] This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2.

occurs when congress expresses its intent to occupy a field either directly in the terms of the statute or implicitly in the scheme of the federal legislation. *See id.* at 2481–82. Congressional intent is found if the federal legislation is so pervasive as to lead to the reasonable inference that Congress intended to leave no room for the states, if it " 'touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' " or "if the goals sought to be obtained' and the 'obligations imposed' reveal a purpose to preclude state authority." *Id.* at 2481–82 (citations omitted).

The second principal way federal regulation preempts state action is "conflict preemption" that occurs even when Congress has not chosen to occupy a particular field. *Id.* at 2482. Preemption will occur to the extent that there is an actual conflict between federal and state law. *See id.* A conflict will arise when compliance with both the federal and state laws is a physical impossibility or when a state law is a barrier to the accomplishment and execution of Congress objectives and purposes. *See id.*

The commission based its dismissal of Hazelton's complaint on the finding that Congress had expressed its intent to preempt the states in the regulation of personnel criteria for the national guard. The commission also found that "the Wisconsin legislature in Chapter 21 of the statutes effectively has committed the state military establishment to participation in the federal guard system."

In reversing the commission, the circuit court examined applicable federal statutes and regulations and held that there was neither "field preemption" nor

"conflict preemption." The circuit court found that WFEA could peacefully co-exist with federal regulation of personnel criteria for the national guard. Finally, the circuit court held that the commission had the authority to determine if Hazelton's transfer to the standby reserve violated Wisconsin's anti-discrimination law.

Both the commission and the circuit court addressed 32 U.S.C. § 108, that provides:

> If, within a time to be fixed by the President, a State does not comply with or enforce a requirement of, or regulation prescribed under, this title its National Guard is barred, wholly or partly as the President may prescribe, from receiving money or any other aid, benefit, or privilege authorized by law.

The commission found that this statute did resolve the conflict between federal and state law. It determined that under this statute, when Wisconsin opted into the federal national guard program, federal law and regulation became supreme.

On the other hand, the circuit court held that this statute lacked a directive that noncompliance with a national guard regulation required the withdrawal of federal recognition of the state's national guard unit. The circuit court reasoned that under this statute presidential action was discretionary and "lockstep compliance with federal regulations [was] not required." Therefore, the circuit court found that Congress' expressed intent was *not* to preempt the states in the regulation of personnel criteria for the national guard.

Both the commission and the circuit court discussed a 1925 case, *State v. Industrial Comm'n,* 186 Wis. 1, 5–7, 202 N.W. 191, 193 (1925), where the Wisconsin Supreme Court held that a predecessor to 32

U.S.C. § 108[8] clearly demonstrates that state compliance with then existing federal regulation of the national guard was optional.

We do not accept the circuit court's conclusion that Congress has not preempted the states in the regulation of qualification standards for continued appointment to the national guard. First, the decision of the Wisconsin Supreme Court in *State v. Industrial Commission* did not address whether congressional establishment of qualifications for members of the national guard preempted state regulations. Rather, the supreme court's opinion narrowly focused on whether a national guard member injured during training was a member of the federal army and not entitled to worker's compensation because of federal employee status, or had state employee status and was entitled to worker's compensation because the national guard was a state institution. *Industrial Comm'n*, 186 Wis. at 2, 202 N.W. at 192. In addition, major amendments to the legislation existing in 1925 were enacted in 1933 and 1952, *see Perpich v. United States Department of Defense*, 880 F.2d 11, 14–15 (8th Cir. 1989), *aff'd*, 496 U.S. 334 (1990); therefore, the continued vitality of the Wisconsin Supreme Court's reasoning must be questioned.

A more serious flaw in the circuit court's analysis is its failure to consider the explicit grants of power to Congress in United States Constitution art. I, § 8, cl. 11–14, that provide,

[Congress shall have power:]

---

[8] The National Defense Act of June 3, 1916, 39 Stat. 212, ch. 34, § 116 (1916).

> To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;
>
> To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;
>
> To provide and maintain a Navy;
>
> To make Rules for the Government and Regulation of the land and naval Forces . . . .

The circuit court did not consider the interrelationship of these four clauses with the two militia clauses that follow immediately in United States Constitution art. I, § 8. These two clauses provide:

> [Congress shall have power:]
>
> To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions . . . .

U.S. CONST. art. I, § 8, cl. 15.

> To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress . . . .

U.S. CONST. art. I, § 8, cl. 16.

The interrelationship of these six clauses was discussed in recent decisions from the federal courts. In 1987, Governor Perpich and the State of Minnesota brought an action seeking a declaratory judgment that federal legislation, known as the Montgomery Amend-

ment,[9] "infringes 'the Authority of training the Militia' reserved to the States by the Constitution." *Perpich*, 880 F.2d at 13. The Montgomery Amendment barred a governor from withholding permission for national guard training outside of the United States. *Id.* Sitting *en banc,* the Eighth Circuit held that Congress has plenary and exclusive power over the army and could prohibit a governor from vetoing the training of the national guard as a federal reserve force. *Id.* at 17–18.

In affirming the decision of the Eighth Circuit, the United States Supreme Court held that, when read as a whole, the plain language of these six concurrent clauses, *see Perpich*, 496 U.S. at 339–40, "recognizes the supremacy of federal power in the area of military affairs," *id.* at 351, and subjects the "state militia to express federal limitations." *Id.* at 354. *Perpich* is concerned with congressional control of the training of national guard members called to federal service. *See id.* at 349.

In a case involving a request that a federal district court monitor the training of the Ohio National Guard, the Supreme Court wrote that article I, § 8, cl. 16 of the United States Constitution was an explicit grant of power to Congress to organize, arm and discipline the national guard. *Gilligan v. Morgan*, 413 U.S. 1, 6 (1973). The Supreme Court did note that the militia clause reserved certain responsibilities to the states but did not discuss whether those responsibilities were limited in any manner. *Id.*

In *Perpich,* the Supreme Court concluded that the militia clause strengthens Congress' exclusive and plenary power in the area of military affairs in three ways.

---

[9] The Montgomery Amendment was enacted as sec. 522 of the Defense Authorization Act for Fiscal Year 1987 and is codified in 10 U.S.C. § 672(f).

First, the militia clause authorizes Congress to provide for "organizing, arming and disciplining the Militia." *Perpich*, 496 U.S. at 350. Since 1792, Congress has chosen to exercise this power in several ways. At first, Congress was content with declaring every able-bodied male between the ages of eighteen and forty five to be a member of a "Uniform Militia," requiring members to arm themselves, and prescribing how they were to present themselves for training and for service. *See id.* at 341. In 1901, Congress abolished the century old "Uniform Militia" and, in 1903, created the national guard. *See id.* at 341–42. As a result of the widening war in Europe, Congress "federalized" the national guard in 1916. *See id.* at 343–44. In 1933, Congress made major amendments to the 1916 legislation and, in 1952, made more changes to broadly incorporate all national guard units into the modern army. *See id.* at 345–46. This brief history confirms that Congress has aggressively exercised its power under the constitution to organize, arm and discipline the militia and, now, the national guard.

The second means by which the militia clause strengthens Congress' exclusive power is authorization to govern the militia when in the service of the United States. *See Perpich*, 496 U.S. at 350.

"Finally, although the appointment of officers and the Authority of training the Militia is reserved to the States respectively, that limitation is, in turn, limited by the words 'according to the discipline prescribed by Congress.' " *Id.* The Supreme Court classifies the state's authority to train the national guard as *subordinate authority*. *Id.* at 350–51. Likewise, the phrase, "according to the discipline prescribed by Congress," limits the state's authority to appoint officers.

*Id.* at 350. Therefore, the state's appointment authority is *subordinate* to the authority of Congress.

If the personnel criteria of an effective army require the discharge or transfer to the standby reserve of an HIV-positive national guard member, Congress has the authority to prescribe such personnel criteria. The authority reserved to the states to appoint officers does not include the right to question or waive personnel criteria prescribed by Congress. *See id.* at 350–51.

Only one other state has considered the issue of whether federal regulation of the national guard preempts the application of the state's anti-discrimination law to the discharge of an HIV-positive member. In *C.J. v. Vuinovich*, 599 A.2d 548, 553–54 (N.J. Super. Ct. App. Div. 1991), the appellate court cited *Perpich* to support its conclusion that "[p]laintiff's discharge and transfer from active duty to the standby reserve was compelled by Department of the Army Regulation 600–110. The Guard, as part of the United States Military, was required to take the very action complained of by the plaintiff." *Id.* at 553. The appellate court also noted that state judicial intervention would be appropriate only if it was permitted by federal regulations. *Id.* at 554.

*Perpich* establishes the supremacy of Congress in the regulation of personnel criteria for the national guard. We conclude that the supremacy clause and the principles of preemption prevent the state from regulating personnel criteria of the national guard. The Secretary of the Army, acting under authority delegated by the President as commander-in-chief, *see Gilligan*, 413 U.S. at 6–7, issued Army Regulation 600–110 authorizing the termination of membership of HIV-positive members of the national guard. Because of the supremacy of the federal government in military

affairs, Army Regulation 600–110 " 'touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Mortier*, 111 S. Ct. at 2481–82 (citation omitted). Therefore, we hold that federal law preempts the enforcement of WFEA because Congress and the framers of the constitution intended that the federal government exclusively occupy the field of regulation of personnel criteria for the national guard.

We reach the same conclusion after a review of Wisconsin's Constitution and statutes applicable to WIARNG. Wisconsin Constitution art. IV, sec. 29 provides, "[t]he legislature shall determine what persons shall constitute the militia of the state, and may provide for organizing and disciplining the same in such manner as shall be prescribed by law." Under this grant of power, the state legislature has enacted ch. 21, Stats., "Department of Military Affairs."

Under ch. 21, Stats., the legislature provides that WIARNG shall conform to federal laws and regulations. For example, sec. 21.01(1), Stats., requires that the appointment of WIARNG members must be in accordance with federal law or regulation governing or pertaining to the national guard.[10] Section 21.03, Stats., authorizes the governor to distribute weapons under the provisions of any acts of Congress for the equipping of the national guard. Section 21.05, Stats., requires all officers of WIARNG to satisfy the physical requirements prescribed by the national guard bureau.

---

[10] Prior to 1976, sec. 21.01(1), Stats., did not require that the appointment of officers to WIARNG be "in accordance with federal law or regulations governing or pertaining to the national guard." This requirement was added by sec. 21, ch. 189, Laws of 1975 (effective April 9, 1976).

Section 21.32, Stats., requires the chief surgeons of WIARNG to provide physical examinations as required by the department of defense and national guard regulations. Section 21.35, Stats., requires "[t]he organization, armament, equipment and discipline of the Wisconsin national guard shall be that prescribed by federal laws or regulations." Section 21.36(1), Stats., details the adoption of several federal rules and regulations:

> The rules of discipline and the regulations of the armed forces of the U.S. shall, so far as the same are applicable, constitute the rules of discipline and the regulations of the national guard; the rules and uniform code of military justice established by congress and the department of defense for the armed forces shall be adopted so far as they are applicable and consistent with the Wisconsin code of military justice for the government of the national guard, and the system of instruction and the drill regulations prescribed for the different arms and corps of the armed forces of the U.S. shall be followed in the military instruction and practice of the national guard, and the use of any other system is forbidden.

Finally, sec. 21.36(2) authorizes the governor to "make and publish rules, regulations and orders for the government of the national guard, *not inconsistent with the law*. *Id.* (emphasis added). The repeated references to federal law, federal regulation, department of defense, and national guard regulations lead to the conclusion that the Wisconsin legislature has acquiesced to the supremacy of Congress in the area of the regulation of members of WIARNG.

In summary, we conclude that acting under specific grants of power in the United States Constitution,

Congress expressed its clear intent to preempt the states in establishing and regulating personnel criteria for the national guard. Therefore, we hold that the circuit court erred in reversing the decision of the commission that federal preemption deprived the commission of the authority to consider Hazelton's complaint.

*By the Court.*—Order reversed.

BROWN, J. (*concurring*). I agree with the opinion of this court. I write separately only to say that I do not understand why the army would refuse to apply its new April 11, 1988 policy retroactively to Major Hazelton's case. The old policy was in force for only four months before it was changed—obviously reflecting the prevalent scientific view regarding HIV. I also point out that Major Hazelton's discharge came only eleven days before the new policy was effective. Finally, I note that Major Hazelton is the only person in the Wisconsin National Guard to whom the short-lived policy was actually applied. I agree with the court's opinion, however, that his remedy lies in federal court.