Patricia JOCZ, Plaintiff-Appellant,†

v.

LABOR & INDUSTRY REVIEW COMMISSION and Sacred
Heart School of Theology, Defendants-Respondents.

Court of Appeals

*No. 93–3042. Submitted on briefs August 2, 1994.—Decided
August 8, 1995.*

(Also reported in 538 N.W.2d 588.)

†Petition to review denied.

276

For the plaintiff-appellant the cause was submitted on the briefs of *Steven G. Kmiec* of *Kmiec Law Offices*, of Milwaukee.

For defendant-respondent Sacred Heart School of Theology the cause was submitted on the briefs of *John M. Loomis* and *Katherine L. Williams* of *Beck, Chaet, Loomis, Molony & Bamberger, S.C.*, of Milwaukee.

For defendant-respondent Labor and Industry Review Commission the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Richard Briles Moriarty*, assistant attorney general.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

SULLIVAN, J.   Patricia Jocz appeals from a trial court order affirming a Labor and Industry Review Commission (the Commission) order that dismissed her employment discrimination complaint against the Sacred Heart School of Theology, a Roman Catholic seminary, based on lack of subject matter jurisdiction. Jocz alleged in her complaint that the seminary violated the Wisconsin Fair Employment Act (WFEA), § 111.31, STATS., *et seq.*, when it did not renew her employment contract allegedly because of her sex and her opposition to discriminatory practices. The administrative law judge concluded that the Department of Industry, Labor, and Human Relations (the Department) lacked subject matter jurisdiction to review the discrimination complaint because such review would

violate the Free Exercise Clause of the First Amendment to the United States Constitution[1] and the Freedom of Worship Clause of Article I, Section 18 of the Wisconsin Constitution.[2] The Commission affirmed the administrative law judge's conclusion, as did the trial court.

On appeal to this court pursuant to Chapter 227, STATS., Jocz essentially presents the following issues for review: (1) whether the Free Exercise Clause of the First Amendment to the United States Constitution or the Freedom of Worship Clause of Article I, Section 18 of the Wisconsin Constitution deprives the Department of subject matter jurisdiction to review and investigate employment discrimination complaints filed by employees of religious associations such as the Sacred Heart School of Theology; and (2) whether the Commission erred when it concluded that Jocz's position as Director of Field Placement at the seminary was "min-

---

[1] U.S. CONST. amend. I, provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

[2] WIS. CONST. art. I, § 18 (amended 1982), provides:

The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

isterial," thereby invoking the seminary's constitutional Free Exercise protection.[3]

We hold that neither the Free Exercise Clause of the United States Constitution, nor the Freedom of Worship Clause of the Wisconsin Constitution, categorically deprives the Department of subject matter jurisdiction to review and investigate whether evidence supports a WFEA employment discrimination complaint filed against a religious association. If the employment position at issue, however, is inherently "ministerial" or "ecclesiastical," the religious protection embodied in the federal and state constitutions precludes the state and its agencies from enforcing the mandates of the WFEA against the religious association. Further, we conclude that the Commission did not err in determining that Jocz's position as Director of Field Placement was "ministerial." Accordingly, because the position is "ministerial," the State is precluded from enforcing the WFEA's sex discrimination prohibition against the seminary; thus, the Commission properly dismissed Jocz's complaint.

## I. BACKGROUND

The Commission adopted the following findings of fact that the administrative law judge made after a three-day hearing on the Department's subject matter

---

[3] Jocz also raises a tertiary issue—whether the seminary undertook a duty to refrain from sex discrimination when it allegedly contracted with the federal Veterans Administration Medical Center for benefits and V.A. loans to students. The Commission never addressed this issue; thus, under the limited scope of our Chapter 227 review, we do not address it. Section 227.57(1), STATS. ("The review shall be conducted by the court without a jury and *shall be confined to the record.*" (Emphasis added.)).

jurisdiction. The Sacred Heart School of Theology first employed Jocz in 1971 as a part-time teacher of "catechetics," the methodology of religious teaching.[4] She gradually became more involved in arranging and supervising seminary students in "field placements," that is, "pastoral" positions at parishes, hospitals, and jails. In January 1973, the seminary appointed Jocz to the position of "Pastoral Field Education Personnel," and from September 1973 to August 1974 she held the position of "Placement Supervisor" for the seminary's religious education program.

After the Vatican Council II, the Roman Catholic Church issued norms to increase the Church's emphasis on "pastoral" formation of priests. In 1974, the seminary created the Department of Field Education to

---

[4] The Sacred Heart School of Theology is a theological seminary of the Roman Catholic Church. The seminary provides the final religious preparation of its students before ordination into the priesthood through Holy Orders, one of the seven sacraments recognized by the Roman Catholic faith. A successful student receives the seminary's master of divinity degree after roughly four years of graduate-level preparation.

The seminary is a non-profit "religious, educational, and charitable" corporation organized under Chapter 181, STATS. It is operated by a Roman Catholic religious order, the Congregation of the Priests of the Sacred Heart. The seminary's president and rector report to the provincial superior of the order's North American province. The provincial superior reports to the order's general superior at the Vatican. The general superior of the order reports to the pope. The pope also governs seminaries as a group, whether operated by religious orders or church dioceses, through the Sacred Congregation for Catholic Education. This is a Vatican agency that assists the pope and can act on behalf of the "Holy See," that is, the office and authority of the pope, on issues involving the seminaries and the formation of priests.

285

increase seminary students' "pastoral" development outside of the classroom. The seminary selected Jocz "to organize, develop, and lead" the new department. Jocz's original title was "Coordinator of Field Education," but the seminary formally changed it to "Director of Field Education" in 1978. Jocz and the seminary signed a series of written employment agreements, "including an umbrella agreement for 1978-81, and one for 1981-86 explicitly requiring a separate contract for each year setting forth specific terms." The parties further "entered into separate agreements for each academic year from 1974-75 through 1977-78 and 1979-80 through 1984-85."

In 1981, the United States National Conference of Catholic Bishops promulgated *The Program for Priestly Formation*, a set of guidelines approved by the Sacred Congregation for Catholic Education, which governed all Roman Catholic seminaries in the United States.[5] *See generally* NATIONAL CONFERENCE OF CATHOLIC BISHOPS, THE PROGRAM OF PRIESTLY FORMATION (3d ed. 1982). *The Program*, as summarized by the administrative law judge, set forth the following provisions governing the Director of Field Education—a position that had to be filled by a member of the Roman Catholic faith:

---

[5] The Roman Catholic Church has promulgated church laws, policies, and other norms that govern the position of Director of Field Education at the seminary, including: the *Codex Luris Canonici* (1983) (the "Code of Canon Law"), which contains the Catholic Church's general legislation; the *Ratio Fundamentalis*, which sets forth the basic guidelines for all Roman Catholic seminaries in the world and which guides the development of national programs; and *The Program for Priestly Formation*, a national program which governs all seminaries in the United States.

"The field education program should be entrusted to a director who has full faculty status. The director will have the responsibility of developing the program and evaluating the performance of the seminarians and should be professionally trained for this work. The training should be particularly in two areas: first, in theology, so that field education may be a truly theological discipline; second, in supervisory techniques," a learnable skill, as demonstrated in various professions. Other disciplines may be added, "such as religious sociology, psychology, counseling, and group dynamics."

"Above all, the director of field education must have had personal pastoral experience. This role in the overall seminary program is crucial and the director will have a unique opportunity, not ordinarily shared by others on the academic faculty, to teach and judge the seminarians in a special forum."

"Any apostolic program under a trained supervisor will be far more educationally fruitful than one directed by an untrained faculty member. Until such a trained supervisor is prepared, however, interim personnel can direct the work so that the implementation of the program is not postponed."

(Administrative Law Judge Findings of Fact (quoting THE PROGRAM, *supra* at 58-59; citations omitted)).

In June 1981, Pope John Paul II mandated a papal visitation of all Roman Catholic seminaries in the United States. On February 13-17, 1984, the papal visitation team, including the Pope's personal representative, visited the Sacred Heart seminary. The visitation team then finalized a report on the seminary, including a discussion on the Department of Field Education, and transmitted it to the Holy See in 1985. (*See* *supra* note 4 discussing "Holy See."). In 1986, as part of its response to the papal visitation team's report on the

United States seminaries, the Holy See promulgated administrative polices concerning Roman Catholic institutions such as the seminary. One of these policies provided that: "Directors of Field Education at such seminaries should be experienced priests, to enhance the quality of the Field Education program's supervision and theological reflection concerning (1) the relationship between the pastoral situation and the priesthood, and (2) the specific priestly contributions to be made in the pastoral situation." (Quotation from Administrative Law Judge findings.)

Prior to the beginning of the 1985-86 school year, the seminary's then-rector, the Rev. Thomas J. Garvey, decided it was in "the best interests" of the seminary not to offer Jocz a contract for the Director of Field Education position for the 1985-86 school year. According to the administrative law judge: "The reason or reasons underlying this decision [we]re the subject of a sharp factual dispute not at issue in this phase of the proceeding." Jocz declined an associate director position, and her employment with the seminary terminated after the 1984-85 school year.

On January 18, 1985, Jocz filed a complaint with the Equal Rights Division of the Wisconsin Department of Industry, Labor, and Human Relations. The complaint alleged that when the seminary failed to renew her employment contract, it discriminated against her because of her sex and her opposition to discriminatory practices (retaliation). Consequently, she alleged that these actions violated the WFEA.

After a lengthy independent investigation by the United States Equal Employment Commission, the Equal Rights Division conducted its own investigation and on November 28, 1989, issued an initial determination that there was probable cause that the

seminary impermissibly discriminated against Jocz. A hearing before an administrative law judge was set, but the seminary later moved to bifurcate the proceedings so that in the initial phase of the hearing the administrative law judge could rule solely on the issue of whether the federal and state constitutions deprived the Department of subject matter jurisdiction over the complaint. After a three-day evidentiary hearing in May 1990, the administrative law judge issued an exhaustive memorandum decision, concluding that, because employment as the Director of Field Education was "beyond a reasonable doubt a matter of church administration and ecclesiastical cognizance," the Equal Rights Division "lack[ed] subject matter jurisdiction over" the case due to the First and Fourteenth Amendments to the United States Constitution and Article I, Section 18 of the Wisconsin Constitution.

Jocz filed a timely petition for review with the Labor and Industry Review Commission. The Commission affirmed and adopted the administrative law judge's decision and conclusions. Jocz then petitioned for review of the Commission's decision with the trial court, which affirmed the Commission's decision on October 5, 1993.

## II.  STANDARD OF REVIEW

■

Jocz appeals the trial court's order pursuant to § 227.58, STATS.[6] In reviewing a trial court's ruling on an administrative decision, however, we review the

---

[6] Section 227.58, STATS., provides:

**Appeals.** Any party, including the agency, may secure a review of the final judgment of the circuit court by appeal to the court of appeals within the time period specified in s. 808.04 (1).

agency's decision, not the trial court's reasoning. *Barakat v. DHSS,* 191 Wis. 2d 770, 778, 530 N.W.2d 392, 395 (Ct. App. 1995). Nonetheless, we apply the same standard and scope of review as that which the trial court employed when it reviewed the agency's decision. *Id.* The subsections of § 227.57, STATS., delineate the specific scope of review we use to resolve each issue; therefore we discuss the specific relevant subsection with each of Jocz's arguments.

## III.  SUBJECT MATTER JURISDICTION AND CONSTITUTIONAL PRECLUSION

The first issue Jocz raises is whether the Free Exercise Clause of the First Amendment to the United States Constitution or the Freedom of Worship Clause of Article I, Section 18 of the Wisconsin Constitution deprives the Department of the subject matter jurisdiction to review and investigate alleged violations of the WFEA by religious associations. At loggerheads are the State's duty to enforce the anti-discrimination laws promulgated by the Wisconsin Legislature and a religious association's protection against State interference embodied in the state and federal constitutions. *See generally* Bruce N. Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations,* 79 COLUM. L. REV. 1514 (1979) (discussing tension between anti-discrimination laws and religious free-exercise claims).

In the case at bar, the administrative law judge and the Commission concluded as a matter of law that the Department lacked subject matter jurisdiction over the complaint, and Jocz's complaint was therefore dismissed. This question raises an issue of law and the

scope of our review is set forth by § 227.57(5), STATS.[7] "Ordinarily we give deference to an agency's decisions on questions of law because of the agency's special expertise and experience." *Hazelton v. State Personnel Comm'n,* 178 Wis. 2d 776, 785, 505 N.W.2d 793, 797 (Ct. App. 1993). When the decision of the agency, however, deals with either the scope of the agency's powers, its competency, or its subject matter jurisdiction to decide an issue, our review is *de novo* and we will not give any deference to the agency's decision on that issue. *Loomis v. Wisconsin Personnel Comm'n,* 179 Wis. 2d 25, 30, 505 N.W.2d 462, 464 (Ct. App. 1993).

*1. Legislative Authority Conferred under the WFEA.*

Before we reach the constitutional issue raised in this case, we first discuss the basic question of whether the Wisconsin legislature conferred upon the Department the subject matter jurisdiction to review and investigate employment discrimination complaints filed against religious associations. On this question, our answer differs from that of the administrative law judge, the Commission, and the trial court, because we conclude that the Department has such subject matter jurisdiction.

Although Article VII, Section 8, of the Wisconsin Constitution grants circuit courts "plenary jurisdiction over 'all matters civil and criminal within this state,' " *see Kotecki & Radtke, S.C. v. Johnson,* 192 Wis. 2d 429,

---

[7] Section 227.57(5), STATS., provides:

The court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law.

438 n.6, 531 N.W.2d 606, 610 n.6 (Ct. App. 1995) (citation omitted), the authority and powers of an administrative agency are statutorily created and defined solely by the legislature. *See Elroy-Kendall-Wilton Sch. v. Cooperative Educ. Serv. Agency, Dist. 12 (CESA 12),* 102 Wis. 2d 274, 278, 306 N.W.2d 89, 91 (Ct. App. 1981) (stating administrative agency "created by the legislature has only those powers which are expressly conferred or which are necessarily implied from the statutes under which it operates"); *Nekoosa-Edwards Paper Co. v. Public Serv. Comm'n,* 8 Wis. 2d 582, 593, 99 N.W.2d 821, 827 (1959) (concluding administrative agencies "have no common law power"). Further, if there is any reasonable doubt as to "the existence of an implied power of an administrative agency," it "should be resolved against the exercise of such authority." *Elroy-Kendall-Wilton Sch.,* 102 Wis. 2d at 278, 306 N.W.2d at 91 (citation omitted).

■ Under the WFEA in effect at the time Jocz filed her complaint with the Equal Rights Division, the legislature conferred upon the Department and its designated agents or agencies the authority to "administer" the WFEA, including the power to "conduct in any part of th[e] state any proceeding, hearing, investigation or inquiry necessary to perform its functions." *See* § 111.375(1), STATS. (1983-84).[8] Further, the legislature conferred upon the Department the power to

_____

[8] Section 111.375(1), STATS. (1983-84), provided in relevant part:

**Department to administer. (1)** . . . this subchapter shall be administered by the department. The department may make, amend and rescind such rules as are necessary to carry out this subchapter. The department or the commission may, by such agents or agencies as it designates, conduct in any part of this state

"receive and investigate a complaint charging discrimination or discriminatory practices . . . in a particular case if the complaint is filed with the department no more than 300 days after the alleged discrimination . . . occurred." Section 111.39(1), STATS. (1983-84).[9]

any proceeding, hearing, investigation or inquiry necessary to the performance of its functions.

[9] Section 111.39, STATS. (1983-84), provided in relevant part:

**Powers and duties of department** . Except as provided under s. 111.375 (2), the department shall have the following powers and duties in carrying out this subchapter:

(1) The department may receive and investigate a complaint charging discrimination or discriminatory practices or unfair honesty testing in a particular case if the complaint is filed with the department no more than 300 days after the alleged discrimination or unfair honesty testing occurred. The department may give publicity to its findings in the case.

(2) In carrying out this subchapter the department and its duly authorized agents are empowered to hold hearings, subpoena witnesses, take testimony and make investigations in the manner provided in ch. 101. The department or its duly authorized agents may privilege witnesses testifying before them under the provisions of this subchapter against self-incrimination.

. . . .

(4)(a) The department shall employ such examiners as are necessary to hear and decide complaints of discrimination and to assist in the effective administrative of this subchapter. The examiners may make findings and orders under this section.

(b) If the department finds probable cause to believe that any discrimination has been or is being committed or unfair honesty testing has occurred or is occurring, it may endeavor to eliminate the practice by conference, conciliation or persuasion. If the department does not eliminate the discrimination or unfair honesty testing, the department shall issue and serve a written notice of hearing, specifying the nature of the discrimination which appears to have been committed or unfair honesty testing which has occurred, and requiring the person named, in this section called the "respondent", to answer the complaint at a hearing before an examiner. The notice shall specify a time of hearing not less than 30 days

■

With these statutes, the legislature clearly conferred upon the Department and its designated agents or agencies the authority to administer the WFEA, and, *inter alia*, the power to receive and investigate all complaints of discrimination or discriminatory practices as defined within the WFEA. It therefore logically follows that the legislature conferred upon the Department subject matter jurisdiction over all complaints that are brought under the auspices of the WFEA. Accordingly, we now analyze whether an employment discrimination complaint filed against a religious association falls within the scope of the WFEA.

after service of the complaint, and a place of hearing within either the county of the respondent's residence or the county in which the discrimination or unfair honesty testing appears to have occurred. The testimony at the hearing shall be recorded or taken down by a reporter appointed by the department.

(c) If, after hearing, the examiner finds that the respondent has engaged in discrimination or unfair honesty testing, the examiner shall make written findings and order such action by the respondent as will effectuate the purpose of this subchapter, with or without back pay. If the examiner awards any payment to an employe because of a violation of s. 111.321 by an individual employed by the employer, under s. 111.32 (6), the employer of that individual is liable for the payment. Back pay liability may not accrue from a date more than 2 years prior to the filing of a complaint with the department. Interim earnings or amounts earnable with reasonable diligence by the person discriminated against or subject to unfair honesty testing shall operate to reduce back pay otherwise allowable. Amounts received by the person discriminated against or subject to the unfair honesty testing as unemployment benefits or welfare payments shall not reduce the back pay otherwise allowable, but shall be withheld from the person discriminated against or subject to unfair honesty testing and immediately paid to the unemployment reserve fund or, in the case of a welfare payment, to the welfare agency making the payment.

Under the WFEA, with certain limited exceptions, "no employer . . . may engage in any act of employment discrimination as specified in [§ ] 111.322 against any individual on the basis of age, race, creed, color, handicap, marital status, sex, national origin, ancestry, arrest record or conviction record." Section 111.321, STATS. (1983-84). Non-profit religious associations are considered "employers" under the WFEA. *See* § 111.32(6), STATS. (1983-84) (defining "employer" as "any . . . person engaging in any activity, enterprise or business employing at least one individual").[10] Hence, the statutes empower the Department to review and investigate employment discrimination complaints filed against religious associations. *See Sacred Heart Sch. Bd. v. LIRC,* 157 Wis. 2d 638, 644, 460 N.W.2d 430, 433 (Ct. App. 1990); *Ohio Civil Rights Comm'n v. Dayton Christian Sch. Inc.,* 477 U.S. 619, 628 (1986) (declaring that there is no constitutional violation for "merely investigating" the circumstances of employment discharge from religious school). In this case the Equal Rights Division did investigate Jocz's complaint and concluded that there was probable cause to believe the seminary discriminated against Jocz.

---

[10] Under the original WFEA as enacted in 1977, religious associations were specifically excluded from the Act's definition of "employer." *See* § 111.31(3), STATS. (1977) ("The term 'employer' shall include each agency of the state and any employer as defined in s. 41.02 (4), but shall not include a . . . religious association not organized for private profit."); *see also* David C. Rice, *The Wisconsin Fair Employment Act and the 1982 Amendments,* WIS. BAR BULL., Aug. 1982, at 17, 59. The 1982 amendments to the WFEA removed this complete exemption. *See* Laws of 1981, ch. 334, § 4; Rice, *supra* at 17-18.

### 2. Free Exercise and Freedom of Worship Clauses.

Notwithstanding an agency's legislatively created authority and jurisdiction, constitutional religious protection may preclude the State and the courts from enforcing secular mandates on religious organizations. *Cf. Pritzlaff v. Archdiocese of Milwaukee,* 194 Wis. 2d 303, 327, 533 N.W.2d 780, 790 (1995) (concluding that First Amendment to United States Constitution prevents state courts from enforcing tort claims alleging that a Roman Catholic archdiocese negligently hired, retained, and supervised a priest). Therefore, we must now address the seminary's argument that the State is constitutionally precluded from enforcing the anti-discrimination provisions of the WFEA against the seminary.

Constitutional law concerning the federal and state constitutions' "religion clauses" is a Gordian knot of overlapping and intertwined precedent and, as one member of our supreme court noted recently: "It is generally acknowledged that this area of First Amendment law is in flux and the United States Supreme Court cases offer very limited guidance." *Pritzlaff,* 194 Wis. 2d at 338, 533 N.W.2d at 794 (Abrahamson, J., dissenting).

Nonetheless, "[w]e are bound by the results and interpretations given the First Amendment" by the United States Supreme Court when interpreting the federal Constitution's religion clauses.[11] *State ex rel. Warren v. Nusbaum,* 55 Wis. 2d 316, 322, 198 N.W.2d

---

[11] The Free Exercise Clause of the First Amendment has been applied to the states through the Fourteenth Amendment.

650, 653 (1972). Further, "[w]hile [the] words used may differ, both the federal and state constitutional provisions relating to freedom of religion are intended and operate to serve the same dual purpose of prohibiting the 'establishment' of religion and protecting the 'free exercise' of religion." *Id.* at 332, 198 N.W.2d at 658. Thus, we must look to the federal religion-clause cases in interpreting Article I, Section 18 of our state constitution. *See King v. Village of Waunakee,* 185 Wis. 2d 25, 55, 517 N.W.2d 671, 684 (1994). *But see id.* at 57-60, 517 N.W.2d at 684-86 (Heffernan, C.J., dissenting) (arguing that religious protection accorded under Article I, Section 18 is greater than that accorded under the First Amendment and that Wisconsin courts should not solely look to cases interpreting the United States Constitution when interpreting the religious clauses of the Wisconsin constitution).[12]

---

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. —, —, 113 S. Ct. 2217, 2225, 124 L.Ed. 2d 472, 489 (1993).

[12] We acknowledge Chief Justice Heffernan's persuasive argument that "[w]e would have to ignore the plain language of the constitutional provisions to conclude that the protection accorded under Article I, section 18 is exactly the same as that provided by the First Amendment to the United States Constitution. The language of these two provisions is very different." *King v. Village of Waunakee,* 185 Wis. 2d 25, 59, 517 N.W.2d 671, 685-86 (1994) (Heffernan, C.J., dissenting). As noted by the Chief Justice, " 'it is the prerogative of the State of Wisconsin to afford greater protection to the liberties of persons within its boundaries under the Wisconsin Constitution than is mandated by the United States Supreme Court under the Fourteenth Amendment.' " *Id.* at 57-58, 517 N.W.2d at 685 (Heffernan, C.J., dissenting) (quoting *State v. Doe,* 78 Wis. 2d 161, 171, 254 N.W.2d 210, 215 (1977)). Indeed, to so hold would be entirely consistent with our Constitutional Framers' "unique contribution . . . to political science and political theory"—federalism:

"No liberty guaranteed by our constitution is more important or vital to our free society than is a religious liberty protected by the Free Exercise Clause of the First Amendment." *State v. Yoder,* 49 Wis. 2d 430, 434, 182 N.W.2d 539, 540 (1971), *aff'd,* 406 U.S. 205 (1972). Further, the basic freedom of the Free Exercise Clause "is guaranteed not only to individuals but also to churches in their collective capacities." *Rayburn v. General Conf. of Seventh-Day Adventists,* 772 F.2d 1164, 1167 (4th Cir. 1985), *cert. denied,* 478 U.S. 1020 (1986). However, "[f]ree exercise of religion does not necessarily mean the right freely to act in conformity with a religion," *Lange v. Lange,* 175 Wis. 2d 373, 383, 502 N.W.2d 143, 147 (Ct. App. 1993), *cert. denied,* 114

> [I]t was the insight of the Framers that freedom was enhanced by the creation of two governments, not one. "In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself."

*United States v. Lopez,* 514 U.S. —, —, 115 S. Ct. 1624, 1638, 131 L.Ed 2d 626, 648 (1995) (Kennedy, J., concurring) (quoting THE FEDERALIST NO. 51, at 323 (James Madison) (Clint Rossiter ed., 1961)). By limiting the religious protection imbued in Article I, Section 18 of the Wisconsin Constitution to the baseline protection of the federal First Amendment, Wisconsin courts undermine the "double security" of our "compound republic." Nonetheless, as an intermediate appellate court in this state we are bound by the pronouncements of the Wisconsin Supreme Court, *see Hutto v. Davis,* 454 U.S. 370, 374-75 (1982) (*per curiam*), and, accordingly, we apply the analysis employed by the majority in *King. See also State v. Miller,* 196 Wis. 2d 238, 245, 538 N.W.2d 573, 576 (Ct. App. 1995) (agreeing with the majority's analysis in *King*).

S. Ct. 1416, 128 L.Ed.2d 86 (1994), and "[t]he United States Supreme Court has recognized the right of the state to place limitations on religious liberty when it is essential to accomplish an overriding governmental interest." *Sacred Heart,* 157 Wis. 2d at 644, 460 N.W.2d at 433 (citation omitted).[13]

Only the most compelling governmental interests allow state interference with free exercise of religion, and although state eradication of discrimination in many cases is a compelling governmental interest, "in a direct clash of 'highest order' interests, the interest in protecting the free exercise of religion embodied in the First Amendment . . . prevails over the interest in ending discrimination." *Young v. Northern Ill. Conf. of United Methodist Church,* 21 F.3d 184, 185 (7th Cir.), *cert. denied,* 115 S. Ct. 320, 130 L.Ed.2d 281 (1994).

The seminary argues that both the federal Free Exercise Clause and the state Freedom of Worship Clause prohibit the Department and the courts from enforcing the WFEA's anti-discrimination mandates against the seminary because the "Director of Field Placement" serves a "ministerial function" at the seminary. Implicit in the seminary's argument is an acknowledgment that neither the federal, nor state Free Exercise Clause *categorically* prevents the Department from enforcing the WFEA's anti-discrimination laws against religious associations such as the

---

[13] The "law of general applicability" test, as stated by the Supreme Court in *Employment Div., Dept. of Human Resources v. Smith,* 494 U.S. 872, 883-90 (1990), is not applicable here because "the First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such' . . . [including] in controversies over religious authority or dogma." *Id.* at 877.

seminary. To give religious employers such a blanket constitutional "talisman" to ward off all secular enforcement of discrimination laws would dangerously encroach upon the Establishment Clause's prohibition against furthering religion by providing a benefit exclusively to a religious association. *See Corporation of Presiding Bishop v. Amos,* 483 U.S. 327, 343 (1987) (Brennan, J., concurring).

Nonetheless, the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment App. Comm'n,* 480 U.S. 136, 144-45 (1987) (footnote omitted). Thus, religious associations must have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 116 (1952). "Ecclesiastical decisions are generally inviolate," *Rayburn,* 772 F.2d at 1167, and "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 713 (1976). Further, "the right to choose ministers without government restrictions underlies the well being of religious community, for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large." *Rayburn,* 772 F.2d at 1167-68 (citation omitted); *see Pritzlaff,* 194 Wis. 2d at 327, 533 N.W.2d at 790 (concluding First Amendment prevents courts from determining what

makes one competent to serve as priest because such determinations "would require [court] interpretation[s] of church canons and internal church policies and practices").[14] Thus, we conclude that the State, and therefore, the Department, is prevented from enforcing the state's employment discrimination laws against religious associations when the employment position at issue serves a "ministerial" or "ecclesiastical" function. *See Rayburn,* 772 F.2d at 1165 (state scrutiny of church's denial of pastoral position to woman would violate Free Exercise Clause); *McClure v. Salvation Army,* 460 F.2d 553, 560-61 (5th Cir. 1972) (enforcement of federal Title VII provisions to employment relationship between church and minister would violate Free Exercise Clause).

The question confronting us thus becomes whether the seminary's Director of Field Placement position serves a "ministerial" or "ecclesiastical" function. This presents a question of law that we review *de novo. See Equal Employment Opportunity Comm'n v. Southwestern Baptist Theological Seminary,* 651 F.2d 277, 283 (5th Cir. 1981), *cert. denied,* 456 U.S. 905 (1982).

Secular courts tread upon dangerous waters when answering this question because it may result "in considerable ongoing government entanglement in religious affairs." *Corporation of Presiding Bishop,* 483

[14] *See also Olston v. Hallock,* 55 Wis. 2d 687, 696-97, 201 N.W.2d 35, 39-40 (1972) (court could not constitutionally review a religious institution's decision to terminate a minister); *Black v. St. Bernadette Congregation,* 121 Wis. 2d 560, 565-66, 360 N.W.2d 550, 553 (Ct. App. 1984) (matters of internal church government are at the core of ecclesiastical affairs and as such are beyond the province of judicial review).

301

U.S. at 343 (Brennan, J., concurring). Consequently, a state agency or court confronting this issue must immediately resolve the question before further investigating or reviewing the employment discrimination complaint. Answering this fundamental question first will prevent invasive or ongoing governmental entanglement with the religious association's internal affairs. *See Young*, 21 F.3d at 186 (forbidding such invasive court inquiry). If the agency or court concludes that the position is "ministerial" or "ecclesiastical," further enforcement of the WFEA against the religious association is constitutionally precluded, and the complaint should be dismissed.

This procedure does not eliminate all problems, however. For example, "[w]hile a church may regard the conduct of certain functions as integral to its mission, a court may disagree." *Corporation of Presiding Bishop*, 483 U.S. at 343 (Brennan, J., concurring). Accordingly, as one commentator has suggested, a court making "the key 'determination [of] whether an activity is religious or secular' must give considerable, if not decisive, weight to the religion's own vision of the distinction." STEPHEN L. CARTER, THE CULTURE OF DISBELIEF: HOW AMERICAN LAW AND POLITICS TRIVIALIZE RELIGIOUS DEVOTION 142-43 (Anchor Books ed., 1994) (citation omitted).[15] Nonetheless, a religious associa-

---

[15] Yale University Law Professor Stephen L. Carter gives the example that "hiring a plumber to fix the sink in the parish hall is not the same as hiring a counselor to work in a religious program to fix dysfunctional families," but then cautions that "[i]f one does happen to encounter a religion that considers the repair of the sink God's work, one must not respond blithely—as the courts too often do—with, 'Really? Well, we don't.' " STEPHEN L. CARTER, THE CULTURE OF DISBELIEF: HOW AMERICAN LAW AND

tion's designation of an employment position as "ministerial" does not necessarily "control [its] extra-religious legal status." *Equal Employment Opportunity Comm'n,* 651 F.2d at 283.

We are persuaded that the following test presents a useful guide for courts to follow when confronted with the question of whether an employment position is "ministerial" or "ecclesiastical": " 'As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered ["ministerial" or "ecclesiastical"].' " *Rayburn,* 772 F.2d at 1169 (quoting Bagni, *supra* at 1545) (bracketed materials added). While this test is not meant to provide the exclusive definition of "ministerial" or "ecclesiastical" functions, it should provide a basic framework for reviewing agencies or courts to follow when addressing the *prima facia* question of whether a position is entitled to constitutional protection from state interference. We next address whether the facts presented in the case at bar accord the seminary constitutional protection from the mandates of the WFEA.

## IV. APPLICATION

Jocz argues that the Commission erred when it concluded that her position as Director of Field Placement at the seminary was "ministerial," thereby precluding the State from enforcing the WFEA's anti-discrimination laws. The parties' briefs on appeal suggest conflicting standards of review that this court is

POLITICS TRIVIALIZE RELIGIOUS DEVOTION 142-43 (Anchor Books ed., 1994).

303

obligated to follow under our Chapter 227 review. Hence, we first resolve this conflict.

As stated above, the question of whether a position is "ministerial" or "ecclesiastical" is a question of law because it requires a reviewing agency or court to apply facts to a constitutional standard. *See Town of East Troy v. Town & Country Waste Serv. Inc.,* 159 Wis. 2d 694, 704, 465 N.W.2d 510, 515 (Ct. App. 1990). Thus, we review this determination *de novo,* pursuant to § 227.57(5), STATS. The determination of historical facts that are applied to this standard, however, presents an issue of fact. Consequently, § 227.57(6), STATS., prohibits this court from "substitut[ing our] judgment for that of the agency as to the weight of the evidence on any disputed finding of fact."[16] This "court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." Section 227.57(6), STATS. Further, determining issues of witness credibility is left solely to the agency as finder of fact. *See* § 227.57(6), STATS.

The Commission, via the administrative law judge, concluded that the Director of Field Education position at the seminary "involved . . . a matter of church administration and ecclesiastical cognizance,"

---

[16] Section 227.57(6), STATS., provides:

If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

or, in the terminology of this opinion, served a "ministerial" or "ecclesiastical" function. In support of this conclusion, the Commission made the following factual determinations:

> "Sacred Heart School of Theology, an integral organ of the Roman Catholic Church, is wholly sectarian in purpose. It offers no secular education. Almost of all [sic] its training and education is for the final professional education of priest-candidates in preparation for the Roman Catholic sacrament of Holy Orders, with the remainder for lay ministries."

> "The Seminary's faculty provides the Church's total formation process for priests, including the academic, spiritual, and pastoral spheres. The Seminary's faculty members, including the Director of Field Education, are intermediaries between the Roman Catholic Church and its future priests. The faculty plays a vital role in propagating the Roman Catholic faith."

> "The Field Education program at the Seminary is an essential, integral component of the Church's formation of priests. It is required and governed by Church norms involving religious beliefs, church doctrines, and church policies. The Church depends on the supervised ministry experiences, theological reflection, and evaluation of pastoral performance provided in this program to prepare seminarians and judge their suitability for ordination. The program is focused exclusively on priest-candidates."

> "The Director of Field Education runs the Field Education program. The Director helps prepare, evaluate, and recommend for ordination the Church's future priests according to Church norms. Through management oversight of and direct participation in Field Education functions, the Director

305

uses professional and management judgment in advancing the Church's objectives for priests-in-training, assessing their performance, and making recommendations and voting on their future. The director is an intermediary between the Church and its future priests. The Director contributes significantly and directly to the Seminary's religious and ecclesiastical purpose, and is important to the religious and spiritual mission of the Church."

Reviewing the record, we can find no "historical" finding of fact made by the Commission that "is not supported by substantial evidence in the record." Section 227.57(6), STATS. The administrative law judge's memorandum decision exhaustively details the functions and history of the Director of Field Education position at the seminary. These findings were made after a three-day hearing on the jurisdictional issue. Although Jocz now attacks the administrative law judge's and Commission's determinations of witness credibility supporting the findings of fact, such credibility determinations are beyond the purview of this court. Accordingly, we now apply the Commission's findings of fact to the legal question of whether the Director of Field Education served a "ministerial" or "ecclesiastical" function. The evidence is overwhelming that it does fill such a function.

Jocz's position implicated several of the primary duties set forth in our guideline: teaching, church governance (i.e., administration) and supervision of a religious order. As such, her position fell clearly within the realm of serving a "ministerial" or "ecclesiastical" function at the seminary. Hence, once the Commission made this determination, it was precluded from enforc-

ing the WFEA mandates, and it properly dismissed Jocz's complaint against the seminary.

In sum, we conclude that the Department is not categorically deprived of subject matter jurisdiction to review and investigate employment discrimination complaints filed against religious associations. In this case, however, the Commission correctly determined that the Director of Field Placement served a "ministerial" or "ecclesiastical" function at the seminary, and the Department was constitutionally precluded from enforcing the WFEA against the seminary. Accordingly, we can locate no "ground[s] for setting aside, modifying, remanding or ordering agency action or ancillary relief," § 227.57(2), STATS., and the trial court order affirming the Commission's decision is affirmed.

*By the Court.*—Order affirmed.